UNITED STATES of America, Plaintiff,

v.

225.25 ACRES OF LAND, MORE OR LESS, SITUATE IN MONROE COUNTY, STATE OF MISSOURI and William A. Moutray, Naomi Moutray, and Unknown Owners, Defendants.

UNITED STATES of America, Plaintiff,

v.

225.25 ACRES OF LAND, MORE OR LESS, SITUATE IN MONROE COUNTY, STATE OF MISSOURI and William A. Moutray, Naomi Moutray, and Unknown Owners, Defendants.

UNITED STATES of America, Plaintiff,

v.

468.93 ACRES OF LAND, MORE OR LESS, SITUATE IN MONROE COUNTY, STATE OF MISSOURI and Garland H. Bertram, and Unknown Owners, Defendants.

UNITED STATES of America, Plaintiff,

v.

371.93 ACRES OF LAND, MORE OR LESS, SITUATE IN MONROE COUNTY, STATE OF MISSOURI and Howard R. Shaw, Bonnie B. Shaw, and Unknown Owners, Defendants.

Nos. 78–900 C (3) to 78–903 C (3).

United States District Court, E. D. Missouri, E. D.

June 3, 1982.

**630**

Edwin B. Brzezinski, Asst. U. S. Atty., St. Louis, Mo., for plaintiff.

Millar, Schaefer & Hoffmann, Gregory F. Hoffmann, St. Louis, Mo., for defendants.

## MEMORANDUM

FILIPPINE, District Judge.

These consolidated cases are before the Court on remand from the United States Court of Appeals for the Eighth Circuit. The Court of Appeals directed this Court to hold a hearing on the issue of whether or not the plaintiff's attempt to take the lands in question in fee comes reasonably within the language of the Congressional authorization of the Clarence Cannon Dam and Reservoir project.[1] *United States v. 255.25 Acres of Land*, 553 F.2d 571 (8th Cir. 1977) (per curiam).

---

1. A fifth consolidated case, Cause No. 78–899C(3), involves only the taking of an easement by the plaintiff on tract No. 1166E, owned by the Moutrays. No appeal was taken by

The Court has now held an evidentiary hearing on the issue. In addition, the parties have submitted detailed stipulations of fact. After consideration of the parties' stipulations of fact and memoranda of law, the testimony and exhibits introduced at trial, and the applicable law, the Court enters the present memorandum opinion, which it adopts as its findings of fact and conclusions of law. Among the parties' stipulations are the following:

1. Defendants William A. Moutray and Naomi Moutray, his wife, were the owners of a 270.04 acre ownership in Monroe County, Missouri, and on April 30, 1974, plaintiff filed a Declaration of Taking on Tract No. 1616, 172.04 acres, and on Tract No. 1620, 78.00 acres.

2. Defendants Howard R. Shaw and Bonnie B. Shaw were the owners of a 160.0 acre ownership in Monroe County, Missouri, and on February 11, 1976, plaintiff filed a Declaration of Taking on Tract No. 1601.

3. Defendant Garland H. Bertram was the owner of a 942 acre ownership in Monroe County, Missouri, and on December 4, 1975, plaintiff filed a Declaration of Taking on Tract No. 1625, 451.98 acres.

4. The Declarations of Taking were filed in connection with the Clarence Cannon Dam and Reservoir Project, Salt River, Missouri, which was authorized by the Flood Control Act of October 23, 1962, Public Law 87–874, substantially in accordance with House Document No. 507.

5. House Document No. 507 [hereinafter H.D. 507] is the Survey Report of the U. S. Army Corps of Engineers for the Joanna (now Clarence Cannon) Reservoir, as re-titled upon submission to the Congress in 1962.

6. The plaintiff bases its authority for these takings on the statutes recited in the Complaint and Declaration of Taking filed in each case, including the Act of October 23, 1962, 76 Stat. 1173, 1180, 1189–1190, which states in pertinent part:

defendants in that action from Judge Wangelin's Order of May 19, 1976, and there is no issue remaining in that action except the amount of compensation due.

Sec. 203. The following works of improvement for the benefit of navigation and the control of destructive floodwaters and other purposes are hereby adopted and authorized ... in accordance with the plans in the respective reports hereinafter designated and subject to the conditions set forth therein:

. . . .

The project for the Johanna Reservoir, Salt River, Missouri [Clarence Cannon Dam Project] is hereby authorized substantially in accordance with the recommendations of the Chief of Engineers in House Document No. 507, Eighty-seventh Congress.

H.D. 507 states at page 33:

g. *Land required.* Real estate acquisition for the main reservoir is limited to the minimum required for operation and maintenance of the project and to permit maximum retention of fee title in private ownership consistent with specific requirements of law. Based on a 5-year flood frequency line, elevation 621 was adopted as the upper limit for acquisition in fee for reservoir operational purposes. Approximately 31,000 acres would be acquired in fee, of which approximately 20,000 acres are cleared lands that would be taken permanently out of cultivation. In addition, approximately 300 acres will be purchased in fee for the emergency spillway and access road. Flowage easements normally would be required for the reservoir operations over the remaining lands within the reservoir area between the fee-taking line, elevation 621, and elevation 641.0, 3 feet above the top of the flood control pool. Of this acreage, presently estimated at approximately 19,900 acres, approximately 600 acres will be purchased in fee for public access, 4,100 acres for mitigation of wildlife losses, and 100 acres to replace part of the lands in Mark Twain State Park which would be inundated by the reservoir. Thus, of the 19,900 acres, only 15,100 acres will be

purchased in easement, with the remainder of about 4,800 acres being purchased in fee and turned over to the various agencies for their control. Approximately 300 acres in flowage easements will also be required below the emergency spillway. Additional lands will be required outside the immediate project area of the main reservoir. These lands acquired in fee amount to approximately 2,100 acres, of which 1,000 acres would be acquired for public access, 600 acres for wildlife mitigation, and 500 acres required to compensate for state park losses. Downstream of the main dam, approximately 2,100 acres will be required for the operation of the regulating pool, of which approximately 800 acres will be acquired in fee and 1,300 acres in flowage easement. Total lands required for the project are estimated at 55,700 acres, of which 39,000 acres would be acquired in fee and flowage easements obtained over 16,700 acres.

7. H.D. 507, upon which the authorization for the Clarence Cannon Dam and Reservoir was based, contains the following:[2]

| | | |
|---|---|---|
| I. Lands in Fee – Total: | 39,000 | Acres |
| A. Lands in Fee below 621 ft. m.s.l. | 31,000 | Acres |
| B. Lands in Fee between 621 ft. m.s.l. and 641 ft. m.s.l. | 4,800 | Acres |
| (1) Purchased for Public Access | 600 | Acres |
| (2) Purchased for Mitigation of Wildlife losses | 4,100 | Acres |
| (3) Purchased to Replace Lands in the Mark Twain State Park | 100 | Acres |
| C. Lands in Fee for Emergency Spillway and Access Road | 300 | Acres |
| D. Lands in Fee Outside the Project Area Total: | 2,100 | Acres |
| (1) For Public Access | 1,000 | Acres |
| (2) For Wildlife Mitigation | 600 | Acres |
| (3) For State Park Losses | 500 | Acres |
| E. Lands in Fee for the Regulating Pool | 800 | Acres |
| II. Lands in Flowage Easement Total: | 16,700 | Acres |
| A. Lands in Flowage Easements Between Elevations 621 and 641 ft. m.s.l. | 15,100 | Acres |
| B. Lands in Flowage Easements below emergency spillway | 300 | Acres |
| C. Lands in Flowage Easements for the Regulating Pool | 1,300 | Acres |

**2.** The Court observes that this stipulation is apparently simply a synopsis of paragraph g.,

quoted in stipulation 6.

8. The following represents plaintiff's best estimates of the acreages it has acquired in fee and flowage easement.

| I. Lands in Fee – Total: | | 54,660 | Acres |
|---|---|---|---|
| A. Lands in Fee below 621 ft. m.s.l. | | 26,316 | |
| B. Lands In Fee between 621 ft. m.s.l. and 641 ft. m.s.l. | | 14,899 | (Total) |
| (1) Purchased for Public Access | | 600 | |
| (2) Purchased for Mitigation of Wildlife Losses | | 4,100 | |
| (3) Purchased to Replace Lands in Mark Twain State Park | | 100 | |
| (4) Emergency spillway and access road | | 300 | |
| (5) Other (No other special use) | | | |
| C. Lands in Fee Outside the immediate project area of the main reservoir | | 11,429 | |
| (1) For Public Access | | 1,000 | |
| (2) For Wildlife Mitigation | | 600 | |
| (3) For State Park Losses | | 500 | |
| (4) Other (No other special use) | | | |
| D. Lands in Fee for the Regulating Pool | | 2,016 | |
| II. Lands in Flowage Easement Total: | | 9,943 | |
| A. Lands in Flowage Easements Between Elevations 621 and 641 ft. m.s.l. | | Unknown | |
| B. Lands in Flowage Easements for the Regulating Pool | | –0– | |

9. As to each of the Consolidated Tracts the following amounts of acreage are [at the elevations] indicated.

Bertram (Tract 1625)

| Total to be Taken | 451.98 | Acres |
|---|---|---|
| A. Below 621 ft. m.s.l. | 245.84 | Acres |
| B. Between 621 and 641 ft. m.s.l. | 91.91 | Acres |
| C. Above 641 ft. m.s.l. | 114.18 | Acres |

Moutray (Tract 1616)

| Total to be Taken | 172.04 | Acres |
|---|---|---|
| A. Below 621 ft. m.s.l. | 111.14 | Acres |
| B. Between 621 and 641 ft. m.s.l. | 39.25 | Acres |
| C. Above 641 ft. m.s.l. | 21.65 | Acres |

Moutray (Tract 1620)

| Total to be Taken | 78 | Acres |
|---|---|---|
| A. Below 621 ft. m.s.l. | 48.80 | Acres |
| B. Between 621 and 641 ft. m.s.l. | 4.45 | Acres |
| C. Above 641 ft. m.s.l. | 24.75 | Acres |

Shaw (Tract 1601)

| Total to be Taken | 160 | Acres |
|---|---|---|
| A. Below 621 ft. m.s.l. | 37.66 | Acres |
| B. Between 621 and 641 ft. m.s.l. | 28.20 | Acres |
| C. Above 641 ft. m.s.l. | 94.14 | Acres |

10. As to all defendants, no part of their lands to be acquired in fee is for "Emergency spillway and Access Road;" "Regulating Pool;" or for "Replacement lands for Mark Twain State Park." As to individual defendants Bertram (Tract 1625) and Shaw (Tract 1601), it is stipulated that no part of the land to be acquired is for "Public Access." As to individual defendant Moutray (Tracts 1616 and 1620) it is stipulated that no part of the land to be acquired is for "Mitigation of Wildlife."

11. The *Joint Policy for Land Acquisition on Reservoir Projects, Department of the Interior—Department of the Army,* was published in the Federal Register of December 23, 1954, Volume 19, Page 8845, and said *Joint Policy* remained in full force and effect from the date of publication until its revision on February 22, 1962.

12. The revised *Joint Policy for Land Acquisition on Reservoir Projects, Department of the Interior—Department of the Army,* was published in the Federal Register on February 22, 1962, Volume 27, Page 1734. This revised *Policy* was republished in the Federal Register of June 28, 1966, Volume 27, Page 1734, and is now codified at 43 C.F.R. § 8.0–8.6.

It is apparent from the foregoing stipulations that the United States has acquired fee title to some 15,660 acres more than the fee acreage authorized by Congress. This excess is due to the purchase of 9,799 extra acres between 621 ft. m.s.l. and 641 ft. m.s.l. (none of which apparently has been taken for a special use); 9,329 extra acres in lands outside the immediate project area (none of which apparently has been taken for a special use); and 1,216 extra acres for the regulating pool. The United States has purchased 4,684 fewer acres in fee below 621 ft. m.s.l. than authorized. It has also purchased flowage easements over 6,757 fewer acres than authorized.

It was established at the hearing on this issue that the reason for the acquisition in fee of the extra lands is that the Survey Report of the Corps of Engineers, which was incorporated into House Document 507, was prepared under the *Joint Policy* for

land acquisition of 1954, but that actual land acquisition proceeded under the 1962 *Joint Policy*. The 1954 *Joint Policy* provided in pertinent part as follows:

Sec. 8.1. Lands to be acquired in fee. The fee title will be acquired to the following lands:

(a) Lands necessary for permanent structures.

(b) Lands below the top of the pool elevation for storing water for navigation, power, irrigation and other conservation purposes.

(c) Fee title in general will be acquired to all land 300 feet horizontally from the edge of the conservation pool described in paragraph (b) of this section. In those projects where the topography is precipitous or where the topography is unusually flat and where such discretionary action is desirable, fee title may be acquired to those lands which are included in the five-year flood frequency rather than 300 feet horizontally.

(d) Additional lands which may be needed to provide for limited public use and reasonable access in accordance with applicable laws or for operation and maintenance of the project.

(e) Lands covered by the exception noted in 8.2(f).

Sec. 8.2. Lands for which easements are to be acquired.

. . . .

(f) Fee title may be taken as necessary where it is to the financial advantage of the government to acquire fee rather than easement. . . .

The 1962 *Joint Policy* provides in part as follows:

1. Lands for reservoir construction and operation.

The fee title will be acquired to the following:

(a) Lands necessary for permanent structures.

(b) Lands below the maximum flowage line of the reservoir including lands below a selected freeboard where necessary to safeguard against the effects of saturation, wave action, and bank erosion and the [sic] permit induced surcharge operation.

(c) Lands needed to provide for public access to the maximum flowage line as described in paragraph (b) of this section, or for operation and maintenance of the project.

2. Additional lands for correlative purposes.

The fee title will be acquired for the following:

(a) Such lands as are needed to meet present and future requirements for fish and wildlife as determined pursuant to the Fish and Wildlife Coordination Act.

(b) Such lands as are needed to meet present and future public requirements for outdoor recreation, as may be authorized by Congress.

Application of the 1954 *Joint Policy* resulted in fee-taking for operational purposes up to 621 ft. m.s.l., the five-year flood frequency level. Application of the 1962 *Joint Policy* required fee-taking up to 642 ft. m.s.l., the maximum flowage line plus freeboard.

Essentially, the defendants' argument is that the Congressional authorization for the Cannon Dam was based upon the application of the 1954 Policy, and therefore that the acquisition of land under the 1962 Policy, resulting in far greater fee-taking than originally planned, simply has not been authorized by Congress. However, defendants do not argue that fee-taking of their land is not required under the 1962 Policy. Nor do they contend that their lands will be used for any purpose other than the Cannon Dam and Reservoir.

House Document 507 did authorize the taking of fee to some lands above 621 ft. m.s.l.: 4,800 acres were authorized to be taken in fee between 621 ft. m.s.l. and 641 ft. m.s.l., for public access, mitigation of wildlife losses, and replacement for Mark Twain State Park lands, and an additional 2,100 acres were authorized to be taken in fee for those purposes "outside the project area," i.e., above elevation 641 ft. m.s.l. Moreover, flowage easements were autho-

rized to be taken on 15,100 acres between 621 ft. m.s.l. and 641 ft. m.s.l. Thus, there was obviously no prohibition on taking fee title to lands above 621 ft. m.s.l.[3]

The judicial role in land condemnation proceedings has consistently been held to be very limited:

> Provided that land can be reasonably related to a public purpose, the United States, in eminent domain proceedings, is not limited to taking in fee the amount of property which will be physically occupied by the public or actually submerged in a flood control operation. . . . Numerous cases sustain the proposition that the purpose intended being valid, the necessity of the taking and the character of the title to be taken are decisions vested exclusively in the Secretary.
>
> . . . .
>
> The only exception to this rule would occur if the delegated official so overstepped his authority that no reasonable man could conclude that the land sought to be condemned had some association with the authorized project. In such a case alone could the taking be considered arbitrary or capricious as those terms are used in condemnation proceedings.

*United States v. 2,606.84 Acres of Land*, 432 F.2d 1286, 1289, 1290 (5th Cir. 1970), *cert. denied*, 402 U.S. 916, 91 S.Ct. 1368, 28 L.Ed.2d 658 (1971) (in part quoting *West, Inc. v. United States*, 374 F.2d 218 (5th Cir. 1967)) (citations omitted). Similarly, the Seventh Circuit has stated that "[t]he only question for judicial review in a condemnation proceeding is whether the purpose for which property was taken is for a Congressionally authorized public use. . . . It is not for the courts to review the necessity of the taking. . . . Only in cases of egregious bad faith will the right to condemn be denied, . . . for in those circumstances the taking may not be for a 'public' use at all." *United States v. 416.81 Acres of Land*, 514 F.2d 627, 631–32 (7th Cir. 1975) (citations omitted). See also *Berman v. Parker*, 348 U.S.

26, 35–36, 75 S.Ct. 98, 103–04, 99 L.Ed. 27 (1954) ("Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch"); *United States v. Mischke*, 285 F.2d 628, 633 (8th Cir. 1961) ("[t]he determination of the Secretary of the Army, the delegate of Congress, as to the necessity of acquiring the lands selected by him, is, we think, no more vulnerable to judicial review or redetermination than would have been the same determination and selection if made by Congress itself in the Act authorizing the project.")

The evidence at trial established that tracts 1620 and 1616 will be used as public access areas. Those portions of tracts 1625 and 1601 between elevations 621 and 641 ft. m.s.l. will be used for mitigation of wildlife losses. The remainder of tracts 1601 and 1625, lying above elevation 641 ft. m.s.l., had to be acquired either because it was more economical to do so than to replace public access (tract 1601) or because blocking requirements necessitate such acquisition (tract 1625).

 Alterations in preliminary plans and specifications do not necessarily render revised plans unauthorized, as a margin for error is assumed. *Allison v. Froehlke*, 470 F.2d 1123 (5th Cir. 1972); *United States v. 2,606.84 Acres of Land, supra*. In the instant case, however, the increase in fee-taking was due to a change in land acquisition policy, not a change in project plans and specifications. Nonetheless, defendants have not attempted to show that the 1962 *Joint Policy* is in itself arbitrary or unreasonable or that its application results in the acquisition of land that can have no association with authorized projects. Moreover, the Board of Engineers for Rivers and Harbors, whose report was incorporated into the Report of the Chief of Engineers, in

---

**3.** In remanding this case, the Court of Appeals noted that "[I]t appears that Document 507 specifically permits the taking of the fee above elevation 621 on some 4800 acres at the least; it appears that if the fee were required on the 15,100 acres remaining, it would come 'substantially' or 'generally' within the plans outlined in the authorization." 553 F.2d at 572.

substantial accordance with which Congress authorized the project, recommended the project "generally in accordance with the plan of the District Engineer, and with such modifications thereof as in the discretion of the Chief of Engineers may be advisable...." H.D. 507 at 7. Thus, the Congressional authorization in effect included a grant of authority to make modifications deemed advisable, and in view of the above-cited cases, the Court believes that the judicial inquiry must end with the finding that the tracts of land at issue will be used in connection with the Cannon Dam and Reservoir, a Congressionally authorized purpose.[4]

Accordingly, the Court will enter an order affirming the plaintiff's authority to take fee simple title to tracts 1601, 1616, 1620, and 1625, as described in the complaints and declarations of taking, both above and below elevation 621 feet, mean sea level, subject to a trial on the issue of just compensation.

---

**4.** The Government's evidence at trial tended to show that the four tracts at issue would have been acquired in their entirety in fee under either *Joint Policy*. The Court believes, however, that it is irrelevant whether or not such is the case, in view of the fact that it is clear that the four tracts at issue, to be acquired under the 1962 *Joint Policy*, will be used in connection with a Congressionally authorized project.