**Charles C. ALLISON et al., Plaintiffs-Appellants,**

v.

**Robert C. FROEHLKE, Secretary of the Army, et al., Defendants-Appellees.**

**No. 72–2219.**

United States Court of Appeals,
Fifth Circuit.

Dec. 27, 1972.

Richard A. Shannon, Austin, Tex., for Charles C. Allison and others.

Lloyd A. Doggett, Austin, Tex., for Save our Streams, and others.

Bob Burleson, pro se and for the Texas Explorers' Club.

William S. Sessions, U. S. Atty., Harold O. Atkinson, Asst. U. S. Atty., San Antonio, Tex., Richard Kleindienst, Atty. Gen., Kent Frizzell, Asst. Atty. Gen., Edmund B. Clark, William M. Cohen, Jacques B. Gelin, Attys., U. S.

Dept. of Justice, Washington, D. C., for defendants-appellees.

Before JOHN R. BROWN, Chief Judge, and MOORE * and RONEY, Circuit Judges.

MOORE, Circuit Judge:

This is an appeal by the plaintiffs from an order entered in this action on June 8, 1972, denying their motion for a preliminary injunction. Thus the sole appellate issue now presented is the propriety of the denial of a preliminary injunction by the district judge in light of the facts and the principles of law relating to preliminary restraining orders. A brief recital of the nature of this action, the parties thereto and the facts presented by the pleadings, affidavits, exhibits and testimony is required as a background against which to judge the decision below.

*The Nature of the Action* [1]

In essence the amended complaint seeks a permanent injunction against the construction of three reservoirs and dams on the San Gabriel River which form part of a flood control project in the Brazos River Basin, namely, Laneport, North Fork and South Fork, all located in Williamson County, Texas. The gist of plaintiffs' allegations is that the project as presently planned and about to be executed by the defendants (1) has not been authorized by Congress; and (2) violates specific environmental and related statutes.[2]

---

* Hon. Leonard P. Moore of the Second Circuit, sitting by designation.

1. As alleged in the First Amended Complaint.

2. Listed in the amended complaint are: the United States Constitution, Article I, § 1 and § 8, Clauses 3 and 18; Article II, § 1, Clause 1; and the Fifth and Fourteenth Amendments thereto; the National Environmental Policy Act of 1969, 42 U.S.C. § 4331 et seq.; the Environmental Quality Improvement Act of 1970, 42 U.S.C. § 4371 et seq.; the Fish and Wildlife Coordination Act

of 1934, as amended, 16 U.S.C. § 661 et seq.; the Act of June 20, 1938, 33 U.S.C. § 540; the Historical and Archeological Preservation Act, 16 U.S.C. § 469 et seq.; the Clean Water Restoration Act of 1966, 33 U.S.C. § 466a et seq.; the Wild and Scenic Rivers Act, 16 U.S.C. § 1271 et seq.; the benefit-cost ratio statute, 33 U.S.C. § 701a; the Water Supply Act of 1958, as amended, 43 U.S.C. § 390b; the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983, providing a civil remedy for deprivation under color of state law of federally protected constitutional and statutory rights; and Executive

## The Parties

The plaintiffs constitute a group having personal and property interests in the areas which they assert will be adversely affected. Thus, for example, the plaintiff Allison is fearful that his land will be condemned if the Laneport Reservoir is constructed; the plaintiff Burleson believes that his enjoyment of canoeing on the River will be lessened and, as President of The Texas Explorers' Club, alleges that wildlife in the area will be jeopardized. The other plaintiffs all share genuine worries as to the effect of the project on the environment. For purposes of this decision, their interests both personal and proprietary are apparent, their concern is respected and their standing to sue recognized.

## The Facts

Reference must briefly be made to antecedent Congressional legislation.

In 1954 Congress authorized a system of reservoirs for flood control and other purposes in the Brazos River Basin (Flood Control Act of 1954, 68 Stat. 1259). Construction of the Laneport Reservoir "substantially in accordance with the recommendations of the Chief of Engineers in House Document Number 535, Eighty-first Congress" was approved and funds for partial accomplishment appropriated.

Thereafter, Congress in 1955 requested the Corps to determine whether a change in site of this reservoir might be advisable. A modification in plan was recommended which added North Fork and South Fork to Laneport. This modification was embodied in the Flood Control Act of 1962, 76 Stat. 1185, again to be "substantially" as recommended by the Chief of Engineers. Reference to this House Document Number 591 will be H. 591.

Because of the many public authorities[3] involved, whose opinions and concurrences had to be obtained, the project proceeded with definitely deliberate speed and at an equally deliberate tempo. And just as length of time in the preparation of a lawsuit usually produces ideas and conceptions, ingenious and otherwise, in direct ratio to time elapsed, so with Engineers. Thus 1968 found the Corps, possibly benefitted by 14 years of deliberation, producing a revised plan, referred to here as Design Memorandum No. 4 and frequently as the Fort Worth District modification.

Although appellants advance many arguments, their basic premise is that the Fort Worth District modification constituted a redesign of the project purposes; that the changes in the redesign were "substantial"; that the Corps "did not submit a report by the Chief of Engineers to Congress which is prerequisite to obtaining Congressional authorization under 33 U.S.C. § 701b–8"; and that authorization of the project as presently proposed was never given by Congress. (Appellants' Br. p. 22). Other fundamental inadequacies are found by appellants in the ultimately-filed Environmental Impact Statement (EIS),[4] which they assert should have been before the Congress when appropriations for the project were sought.

In short, appellants accuse the Corps of usurping the function and powers of Congress by proceeding with their own plans (the redesign) and by completely ignoring Congress. Appellants are

Order No. 11296, 31 F.R. 10663 (1966) as amended by Public Law 90–608, Chapter IV, § 402 (1968), 82 Stat. 1194, see 33 U.S.C. § 701.

3. Amongst these are the Brazos River Authority, the Texas Water Rights Commission, the Texas Water Development Board, the Texas Highway Department, the Texas Parks and Wildlife Department and the Texas State Historical Survey Committee.

4. Environmental Impact Statement, see 42 U.S.C. § 4332; see generally, Cohen & Warren, "Judicial Recognition of the Substantive Requirements of the National Environmental Policy Act of 1969", 13 B.C.Ind. & Com.L.Rev. 685 (1972); Murphy, "The National Environmental Policy Act and the Licensing Process: Environmental Magna Carta or Agency Coup De Grace?", 72 Colum.L.Rev. 963 (1972).

greatly concerned that in addition to the three branches of government, executive, legislative and judicial, there will be created an unwritten, but nevertheless very real, fourth branch, namely, administrative agencies, in this case the Corps.

*The Proceedings and Opinion Below*

The trial court had before it the pleadings, affidavits, and memoranda in support of and in opposition to the motion and, after holding a one-day hearing, made findings of fact which, *inter alia,* included a finding that "[s]ince 1962, plans for the San Gabriel River project have undergone significant alterations * * *." (Finding C, listing 6 alterations), but found that the EIS provided "sufficient information which must be considered pursuant to 42 U.S.C. § 4332, * * *."

■ As to irreparable injury, the court found that there was some probability of irreparable injury to plaintiffs resulting from the letting of contracts to commence construction with countervailing irreparable injury to defendants at the rate of $49,000 per month increased construction costs. The court properly recognized the four prerequisites for the extraordinary relief of preliminary injunction, namely, (1) substantial likelihood of prevailing on the merits; (2) irreparable injury; (3) public interest to be served by granting a preliminary injunction; and (4) any harm possibly resulting, to other parties in the proceeding. The court's conclusion was that "the likelihood that plaintiffs will prevail on the merits is not substantial" and that the Corps' modifications of H.591 (the Fort Worth District Project) were within the "margin of error" as provided therein. The court, therefore, denied the preliminary injunction and held that the motion therefor was "without merit."

The District Court's opinion was limited to the merits of granting or denying a preliminary injunction. The action for a permanent injunction remains to be tried. Upon that trial the parties will have an opportunity to adduce such relevant facts as they are able to assemble. The District Court upon the argument of the motion indicated his cooperation by saying that "We will grant a hearing on the merits as soon as we possibly can, which will be sometime this Fall." (This date has been delayed by the present appeal but in view of the importance of the issues here presented there is no reason to believe that the same cooperation will not continue to be extended.)

On a trial the fundamental issues can be developed far better than on the basis of a one-day hearing, pleadings and affidavits. The nature and extent of the proof regarded as relevant will be within the discretion of the trial court.

Much guidance is to be found in the trial court's opinion in United States v. 2,606.84 Acres of Land in Tarrant Co., Tex., 309 F.Supp. 887 (N.D.Tex.1969) and in this Court's reversal with respect to 1,207 of those acres. The trial court there had to cope with virtually the same arguments as have been advanced here, in substance, that the Corps (not Congress) "made all the actual decisions from beginning to end"; that the property was not taken for the authorized flood control purposes; and that the project was not within the original Congressional authorization. The trial court, therefore, declared the taking to have been unauthorizd and a final judgment was entered.

On appeal (432 F.2d 1286 (5th Cir. 1970)), this Court reversed. Significant are various portions of the Court's opinion in that case which bear on the present action, particularly as they relate to the claim of redesign by the Corps (the Fort Worth District modification):

"It has long been the custom of Congress to approve projects of this nature on the basis of such preliminary plans and to authorize the Chief of Engineers to make such modifications as later studies indicate are necessary." (*Id.* at 1292).

\* \* \* \* \* \*

"We conclude that the Secretary of the Army and the Chief of Engineers

were authorized to deviate from the plans in H.D. 403." (*Id.* at 1293).

\* \* \* \* \* \*

"[T]he Congressional authorization was for a flood control project \* \* \*. This is what the Corps of Engineers built. The area served and the project purposes were not changed. \* \* \* Mere changes in the plans and specifications of the Dam and Reservoir did not render arbitrary and capricious the discretion exercised by the Secretary of the Army and the Chief Engineer pursuant to H.D. 403. Nor did such changes render their actions without authority. In projects of this sort there is a built-in margin for error, leaving room for necessary changes. We hold therefore that the project as built was authorized by Congress in Public Law 14 even though it did not conform exactly to the plans contained in H.D. 403." (*Id.*)

The nature and extent of the trial on the merits will be under the control, and within the discretion, of the trial judge. The trial should be held as expeditiously as possible and should be limited to the material and dispositive issues.

■■■ The Congress authorized the project "substantially in accordance with the recommendations of the Chief of Engineers in House Document Numbered 591, \* \* \*." The key word and issue would appear to be "substantially". The adequate content of the EIS has already been passed upon by the court. The fact that a "botanist, a zoologist, a demographer, or an economist" were not on the staff preparing the EIS does not render it inadequate as a matter of law. A court might well take judicial notice of the fact that from an ornithological point of view the habitat of "the rare golden-cheeked warbler" will be adversely affected, and that creation of the reservoirs will affect the lives of turkey and deer currently in residence on the proposed sites, but omission from the EIS of consideration of the "white crappie, a well known game fish" (Appellants' Br. pp. 36, 39) would scarcely seem to render the EIS constitutionally defective.

The trial and appellate courts in the Eighth Circuit have just had to deal with an almost identical situation in connection with flood control of the Cossatot River in Arkansas. There, both trial court (325 F.Supp. 728) and appellate court, *infra,* found that the Cossatot·is "a valuable asset to man \* \* \*. Fishermen, hunters and outdoor enthusiasts frequent the region; the rapids and pools challenge canoeists. But there is another side of the coin. When heavy rains descend \* \* \* the normal flow of water in the Cossatot becomes a raging torrent and the floods become an enemy of man. Thus, competing forces have aligned themselves for and against the dam." Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army,[5] 470 F.2d 289 (8th Cir., Nov. 28, 1972).

There can be no doubt that the proposed reservoirs will affect the present status of the San Gabriel River to some extent. As Mr. Justice Douglas so eloquently wrote in Sierra Club v. Morton, 405 U.S. 727, 743, 92 S.Ct. 1361, 1370, 31 L.Ed.2d 636 (1972) (dissenting opinion on the question of standing to sue): "The river, for example, is the living symbol of all the life it sustains or nourishes—fish, aquatic insects, water ouzels, otter, fisher, deer, elk, bear, and all other animals, including man, who are dependent on it or who enjoy it for its sight, its sound, or its life." But the San Gabriel, even assuming it serves these beneficent purposes in its more ·placid moments, may well, in its more angry rampaging in moments of flood, cause extensive damage to thousands along its banks unless flood control measures are adopted. This case, as all similar cases, calls for a balancing of these respective interests.

---

5. The facts in that case which relate to the building of the Gillham Dam evoke virtually the same problems which will be presented to the trial court here in the trial on the merits.

The trial judge will undoubtedly hear the merits *pro* and *con* of the proposed project. Adequate guidelines for an orderly trial can be found in our opinion in *2,606.84 Acres, supra,* in the cases therein cited and in the Eighth Circuit case just decided. The trial, if possible, should be kept within reasonable limits. Undoubtedly witnesses and experts can be found who, because of their predilections, will advance their own theories as to how the project should be carried out —if at all. The number of potential alternatives may well be in direct ratio to the number of experts called. To some, even the habitat of the "rare golden-cheeked warbler" should be preserved despite the damage and dangers caused by floods. However, the selection of the important and dispositive issues will be for the trial court. Its cooperation has already been noted. At this juncture it is enough to say that a preliminary injunction was properly denied upon the facts and the law. We trust that a trial on the merits will give all parties an opportunity to develop the essential and determinative facts.

The judgment of the district court is affirmed.