UNITED STATES of America, Appellee,

v.

255.25 ACRES OF LAND, MORE OR LESS, SITUATE IN MONROE COUNTY, STATE OF MISSOURI, and William A. Moutray and Naomi Moutray, and Unknown Owners, Appellants.

Tract No. 1616.

UNITED STATES of America, Appellee,

v.

255.25 ACRES OF LAND, More or Less, SITUATE IN MONROE COUNTY, STATE OF MISSOURI, and William A. Moutray and Naomi Moutray, and Unknown Owners, Appellants.

Tract 1620.

Nos. 82–2026, 82–2027.

United States Court of Appeals, Eighth Circuit.

Submitted April 14, 1983.

Decided July 28, 1983.

Millar, Schaefer & Hoffmann, Gregory F. Hoffmann, St. Louis, Mo., for appellants.

Thomas E. Dittmeier, U.S. Atty., Edwin B. Brzezinski, Asst. U.S. Atty., St. Louis, Mo., Carol E. Dinkins, Asst. Atty. Gen., Edward J. Shawaker, Kathleen P. Dewey, Attys., Dept. of Justice, Washington, D.C., for appellee.

Before ARNOLD, Circuit Judge, and FLOYD R. GIBSON and HENLEY, Senior Circuit Judges.

HENLEY, Senior Circuit Judge.

These consolidated appeals arise from condemnation proceedings instituted by the Secretary of the Army to acquire in fee certain lands owned by appellants William A. and Naomi Moutray for the purpose of

constructing the Clarence Cannon Dam Reservoir Project on the Salt River in Missouri. Appellants raised a number of defenses to the condemnation actions, including, *inter alia,* the assertion that the proposed taking of property above 621 feet mean sea level (m.s.l.), the upper limit for acquisition in fee allegedly established in the federal legislation authorizing the Cannon Project, would contravene the statute. The district court granted the government's motion to strike this and the other defenses raised. This court subsequently remanded the case to the district court with a suggestion to hold an evidentiary hearing on the question whether the proposed fee-taking of appellants' lands above 621 feet m.s.l. fell within the ambit of the authorizing legislation.[1]  *United States v. 255.25 Acres of Land,* 553 F.2d 571, 572 (8th Cir.1977) (per curiam). After the hearing the trial court determined that the taking in question was authorized. We affirm.

The legislation authorizing construction of the Cannon Project provides that it be built "substantially in accordance with the recommendations of the Chief of Engineers in House Document Numbered 507." Act of Oct. 23, 1962, Pub.L. No. 87–874, 76 Stat. 1173, 1189–90. House Document 507 (H.D. 507), which is the report of the survey of the Salt River submitted by the St. Louis District of the Army Corps of Engineers and approved by the Chief of Engineers, sets forth, *inter alia,* the lands required for the Project. In pertinent part, H.D. 507 states,

> Real estate acquisition for the main reservoir is limited to the minimum required for operation and maintenance of the project and to permit maximum retention of fee title in private ownership consistent with specific requirements of law. Based on a 5-year flood frequency line, elevation 621 was adopted as the upper limit for acquisition in fee for reservoir operational purposes. Approximately 31,000 acres would be acquired in fee. . . .
>
> In addition, approximately 300 acres will be purchased in fee for the emergency spillway and access road. Flowage easements normally would be required for the reservoir operations over the remaining lands within the reservoir area between the fee-taking line, elevation 621, and elevation 641.0, 3 feet above the top of the flood control pool. Of this acreage, presently estimated at approximately 19,-900 acres, approximately 600 acres will be purchased in fee for public access, 4,100 acres for mitigation of wildlife losses, and 100 acres to replace part of the lands in Mark Twain State Park which would be inundated by the reservoir. Thus, of the 19,900 acres, only 15,100 acres will be purchased in easement, with the remainder of about 4,800 acres being purchased in fee and turned over to the various agencies for their control. Approximately 300 acres in flowage easements will also be required below the emergency spillway. Additional lands will be required outside the immediate project area of the main reservoir[,] [i.e., above elevation 641]. These lands acquired in fee amount to approximately 2,100 acres, of which 1,000 acres would be acquired for public access, 600 acres for wildlife mitigation, and 500 acres required to compensate for state park losses. Downstream of the main dam, approximately 2,100 acres will be required for the operation of the regulating pool, of which approximately 800 acres will be acquired in fee and 1,300 acres in flowage easement. Total lands required for the project are estimated at 55,700 acres, of which 39,000 acres would be acquired in fee and flowage easements obtained over 16,700 acres.

H.R.Doc. No. 507, 87th Cong., 2d Sess. 33 (1962).

The acreages noted in H.D. 507 were obtained by applying the Joint Policy of the Departments of the Interior and the Army for Land Acquisition on Reservoir Projects, which is no longer in effect. The Joint Policy, promulgated in 1954, established cri-

---

1. The court upheld the portion of the district court's order striking the other defenses asserted. *United States v. 255.25 Acres of Land,* 553 F.2d 571, 572–73 n. 2 (8th Cir.1977) (per curiam).

teria for determining lands to which fee title would be acquired. Specifically, the 1954 Joint Policy provided,

The fee title will be acquired to the following lands:

(a) Lands necessary for permanent structures.

(b) Lands below the top of the pool elevation for storing water for navigation, power, irrigation and other conservation purposes.

(c) Fee title in general will be acquired to all land 300 feet horizontally from the edge of the conservation pool described in paragraph (b) of this section. In those projects where the topography is precipitous, or where the topography is unusually flat, and where such discretionary action is desirable, fee title may be acquired to those lands which are included in the five-year flood frequency rather than 300 feet horizontally.

(d) Additional lands which may be needed to provide for limited public use and reasonable access in accordance with applicable laws, or for operation and maintenance of the project.

Joint Policy for Land Acquisition on Reservoir Projects, 43 C.F.R. § 8.1 (codifying rule published in 19 Fed.Reg. 8845 (1954)). In addition, the 1954 Policy set forth a rule governing the acquisition of lands for collateral purposes. In this regard it stated,

Except as authorized by law, no title to land will be acquired for purposes of preservation of wildlife or forests, restoration or replacement of such values destroyed by reservoirs or for creating additional values of like nature, or for recreational purposes.

*Id.* § 8.6.

After Congress authorized the Cannon Project in October, 1962 the Secretaries of the Interior and the Army promulgated a new policy that established different criteria for determining land acquisition needs for reservoir projects. The 1962 Joint Policy, as it is called, states in pertinent part,

In so far as permitted by law, it is the policy of the Departments of the Interior and of the Army to acquire, as a part of

reservoir project construction, adequate interest in lands necessary for the realization of optimum values for all purposes including additional land areas to assure full realization of optimum present and future outdoor recreational and fish and wildlife potentials of each reservoir.

Joint Policies of the Departments of the Interior and of the Army Relative to Reservoir Project Lands, 43 C.F.R. § 8.0 (codifying rule published in 31 Fed.Reg. 9108 (1966)). With respect to acquisitions of land in fee, the 1962 Policy provides,

The fee title will be acquired to the following:

(a) Lands necessary for permanent structures.

(b) Lands below the maximum flowage line of the reservoir including lands below a selected freeboard where necessary to safeguard against the effects of saturation, wave action, and bank erosion and to permit induced surcharge operation.

(c) Lands needed to provide for public access to the maximum flowage line as described in paragraph 1b, or for operation and maintenance of the project.

*Id.* § 8.1. Like its predecessor, the new policy addresses acquisitions of lands for correlative purposes. It states,

The fee title will be acquired for the following:

(a) Such lands as are needed to meet present and future requirements for fish and wildlife as determined pursuant to the Fish and Wildlife Coordination Act.

(b) Such lands as are needed to meet present and future public requirements for outdoor recreation, as may be authorized by Congress.

*Id.* § 8.2.

In 1966 the Chief of Engineers directed that the 1962 Joint Policy be applied to all ongoing Corps' projects, including the Cannon Project. Application of the new land acquisition policy allowed the government to take fee title to land up to 642 feet m.s.l. rather than the 621 foot elevation adopted under the 1954 Joint Policy. In terms of acreage, application of the criteria estab-

lished by the 1962 Joint Policy has resulted in fee taking of 15,660 acres more than the 39,000 fee acres contemplated in H.D. 507.

The parties in the instant case stipulated that 90.10 acres of land owned by appellants are situated above 621 feet m.s.l. and that 46.40 acres of this amount are above elevation 641. They further stipulated that none of appellants' lands, which constitute two separate tracts, was being sought for the emergency spillway and access road, for the regulating pool, for replacement lands for Mark Twain State Park, or for mitigation of wildlife losses. Noting that H.D. 507 authorizes acquisitions in fee for only one other purpose—public access (recreation)—appellants argued before the district court that the government is not authorized to take in fee any of their property above 621 feet m.s.l. because it had already acquired all the public access acreage it was authorized to acquire under H.D. 507. Appellants contended that any acquisition in fee exceeding the claimed maximum of 1,600 acres for public access specified in H.D. 507 could be accomplished by modifying project plans or specifications, consistent with the language of H.D. 507, *see* H.R.Doc. No. 507, 87th Cong., 2d Sess. 7 (1962), but not by applying a new land acquisition policy.

In addressing appellants' contention that the proposed taking of their property under the criteria of the 1962 Joint Policy, that is, a proposed taking in fee above elevation 621, was unauthorized, the district court stated,

Alterations in preliminary plans and specifications do not necessarily render revised plans unauthorized, as a margin for error is assumed. [Citations omitted.] In the instant case, however, the increase in fee-taking was due to a change in land acquisition policy, not a change in project plans and specifications. Nonetheless, defendants have not attempted to show that the 1962 *Joint Policy* is in itself arbitrary or unreasonable or that its application results in the acquisition of land that can have no association with authorized projects. Moreover, the ... Con-

gressional authorization ... included a grant of authority to make modifications deemed advisable .... [T]he Court believes that the judicial inquiry must end with the finding that the tracts of land at issue will be used in connection with the Cannon Dam and Reservoir, a Congressionally authorized purpose.

*United States v. 255.25 Acres of Land,* 545 F.Supp. 629 at 634 (E.D.Mo.1982).

Appellants attack the district court's determination by asserting that the issue for decision was not necessity, but rather, statutory authorization for the taking. Even if the issue is framed in this manner, appellants cannot prevail.

█ Appellants' contention that Congress authorized a maximum amount of land for public access apparently rests on the premise that the survey report that ultimately became H.D. 507 was intended as a final detailed blueprint of the Cannon Project. The uncontroverted evidence introduced at the hearing clearly establishes the invalidity of this premise. This evidence showed that the survey report was merely a planning document that explored in general rather than detailed terms the feasibility of the engineering and economic aspects of the Project. Moreover, as this court noted in its earlier decision in this case,

[T]he Act authorizes the Cannon Project to be built "substantially in accordance with the recommendations of the Chief [of] Engineers in House Document [Numbered] 507." This language was obviously taken from the written recommendation that the Board of Engineers made to the Congress requesting authorization of the Cannon project which provided that it be built "generally in accordance with the [plan] of the District Engineer[,] and with such modifications thereof as in the discretion of the Chief of Engineers may be advisable." H.R.Doc. No. 507, 87th Cong., 2d Sess. 7 (1962). Finally, the District Engineer recommended the project "generally in accordance with plans outlined herein." *Id.* at 63. Some of the circuits have construed this lan-

guage as being quite sufficient to allow "such modifications as later studies indicate are necessary." *Allison v. Froehlke,* 470 F.2d 1123, 1126 (5th Cir.1972). Indeed, this circuit itself has recognized that the building of dams involves a revision of the original plans as the building process develops. [Citation omitted.]

This court further noted that in the instant case,

> it appears that Document 507 specifically permits the taking of the fee above elevation 621 on some 4800 acres at the least; it appears that if the fee were required on the 15,100 acres remaining, it would come "substantially" or "generally" within the plans outlined in the authorization.

*Id.* The court then suggested that the district court hold an evidentiary hearing to "determine if the fee lands now determined to be necessary for the Cannon project reasonably come within the language of the grant." *Id.* After the hearing, the district court so found.

■ As they did before the district court, appellants argue on appeal that the proposed fee taking of their property above 621 feet m.s.l. does not reasonably fall within the congressional authorization since this allegedly excess acquisition is a result of the application of the 1962 Joint Policy. Contrary to appellants' assertion, however, a taking does not become unauthorized simply because the government proceeds with actual land acquisition under revised criteria. It bears noting that the evidence in the instant case establishes that the two tracts that the government now seeks to acquire in fee would be taken in their entirety under either the 1954 or 1962 Joint Policy. An expert witness for the government testified that under either policy, the government would acquire in fee a number of tracts adjoining appellants' property and lying, at least in part, on the project boundary. He indicated that under both the 1954 and 1962 Joint Policies the requirement of "blocking" these adjoining tracts, that is, of squaring the outer perimeters of the tracts to establish manageable property lines,[2] would result in the two subject tracts being completely surrounded by other lands taken for the reservoir project and therefore becoming inaccessible. The witness specifically refuted a suggestion by counsel for appellants that application of the 1954 Policy would have permitted retention of private ownership of tracts adjoining appellants' land to the extent that the two tracts owned by appellants would have been located on the project boundary. We also note that government witnesses testified that the acreage of the two tracts in question above 621 feet m.s.l. was included in the 1,600 acres specified for public access in H.D. 507 and would have been acquired in fee under that measure.[3] In these circumstances, there is no prohibition against the taking at issue here. *See, e.g., United States v. Willis,* 211 F.2d 1 (8th Cir.), *cert. denied,* 347 U.S. 1015, 74 L.Ed. 871, 98 L.Ed. 1138 (1954). Accordingly, we agree with the district court that nothing in this case requires judicial overthrow of the government's determination that appellants' lands above elevation 621 are necessary to achieve an end authorized by Congress.

The judgment is affirmed.

---

**2.** *See* Joint Policies of the Departments of the Interior and of the Army Relative to Reservoir Project Lands, 43 C.F.R. § 8.4 (codifying rule published in 31 Fed.Reg. 9108 (1966)); Joint Policy for Land Acquisition on Reservoir Projects, 43 C.F.R. § 8.3 (codifying rule published in 19 Fed.Reg. 8845 (1954)).

**3.** This acreage was still designated for public access at the time of the hearing before the district court.