Doris J. BRITT; Robert F. and Marjorie L. Gascon; Carl E. and Thelma V. Schenk; Ryal and Alice DeVost; Gilbert Knapp; Nan Moody; Medicab of Rochester, Inc.; Vic & Irv's Refreshment, Inc.; and Alberta Enterprises, Inc., d/b/a Bill Gray's Family Restaurant, Plaintiffs,

v.

UNITED STATES ARMY CORPS OF ENGINEERS; John O. Marsh, Secretary of the Army; Lt. Gen. E.R. Heiberg, III; Chief of Engineers; United States Army Corps of Engineers; and United States of America, Defendants.

No. CIV–84–1152T.

United States District Court,
W.D. New York.

April 12, 1985.

Robert C. Napier, Rochester, N.Y., for plaintiffs.

Salvatore R. Martoche, U.S. Atty., Rochester, N.Y. (Jonathan W. Feldman, U.S. Atty., Rochester, N.Y., of counsel), for defendants.

## DECISION and ORDER

TELESCA, District Judge.

## INTRODUCTION

Plaintiffs in this case have challenged on various grounds the United States Army Corps of Engineers project to open Ironde-

quoit Bay by the construction of jetties into Lake Ontario, the enlargement of the channel from the Bay into the Lake, and the (at least temporary) removal of the bridge which presently spans the channel. Pending before me is plaintiffs' motion for a preliminary injunction on the grounds that (1) the project does not comply with Public Law 85–500, the Congressional enabling legislation for the project, and (2) the Environmental Impact Statement (EIS) for the project inadequately discusses the traffic and other impacts of severing the existing bridge. For the reasons set forth below, plaintiffs' motion for preliminary injunction is granted.

## FACTS

By Public Law 85–500, known as the "River and Harbor Act of 1958", enacted on July 3, 1958, Congress authorized the enlargement of the existing channel connecting Irondequoit Bay to Lake Ontario by the U.S. Army Corps of Engineers. The project was to be completed in accordance with the plans and subject to the conditions recommended by the Chief of Engineers in House Document (HD) 332, para. 74, which contained the following recommendation:

> That the [project] be subject to the condition that responsible local agencies give assurances satisfactory to the Secretary of the Army that without cost to the United States they will
>
> *    *    *    *    *    *
>
> (f) Replace and relocate the existing highway bridge with a new structure providing a vertical clearance of 40 feet above low-water datum in a location consistent with the recommended plan of improvement, in accordance with plans approved by the Chief of Engineers.

As noted in paragraph 72 of HD 332, the project as authorized was to be constructed "in general accordance with plan A shown on the map accompanying this report with such modifications as in the opinion of the Chief of Engineers may be desirable". Plan A itself indicates that the bridge was to be constructed by "local interests", not

by the Corps of Engineers, at a site different from the current location of the channel.

In 1960, the New York State Department of Public Works was looking at the feasibility of a high-level bridge across the middle of Irondequoit Bay for New York State Route 104. On June 7, 1960, Henry Ten Hagen, Chief Engineer for the Department of Public Works, wrote to Col. Earle B. Butler, then District Engineer of the U.S. Army Engineer District in Buffalo, New York, proposing to construct such a bridge "and to abandon present Route 18 along the shore of Lake Ontario as a State highway route in accordance with the proposal previously submitted to you". This proposal apparently found its way to the Chief of Engineers for the Corps in Washington, and on February 1, 1962, the Chief of Engineers notified the North Central Division Engineer in Chicago that "the proposed deviations from the project document plan [were] satisfactory ...."

In March, 1976, the Corps held a · public hearing on the project, and subsequently created the Irondequoit Bay Opening Policy Committee to represent State and local interests concerned with the project. In December, 1979, the Corps published its Draft Phase I General Design Memorandum and Draft Environmental Impact Statement (DEIS), and circulated it for public review and comment. In July, 1980, the Corps conducted a hearing under Section 404 of the Clean Water Act, 33 U.S.C. Section 1344. In October, 1980, the Corps published its Phase I General Design Memorandum and Environmental Impact Statement: Final (FEIS).

On June 5, 1981, Brigadier General Scott B. Smith, North Central Division Engineer, issued a "record of decision" which recommended the construction of the project using the current location of the channel between the Lake and the Bay, with a movable bridge to be constructed by "local interests" such as New York State. In April, 1982, the Corps issued a Phase II General Design Memorandum (GDM) addressing the final design of the project. On April 14, 1983, a "Local Cooperation Agreement" was signed by the United States of America and Commissioner Orin Lehman of the New York State Office of Parks, Recreation and Historic Preservation on behalf of New York State, in which New York State agreed to construct and maintain any replacement highway bridge across the channel.

The Corps awarded a contract to Luedtke Engineering Company on June 6, 1984 for the construction of a small boat harbor at Irondequoit Bay. Of the contract price of $3,260,000, $1,060,462 has already been paid to the contractor. Although the bridge has not been removed, work under the contract is approximately 35% complete, and is scheduled to be totally completed by September 16, 1985.

On October 11, 1984, plaintiffs filed a 22-count complaint in this action, alleging violations of Public Law 85–500, the National Environmental Policy Act (NEPA), 42 U.S.C. Section 4321 et seq., and other laws protecting the environment, historic sites, and endangered species. On March 28, 1985, plaintiffs filed the instant motion for a preliminary injunction, based solely upon their arguments that the project did not comply with Public Law 85–500 and the EIS did not take a "hard look" at the effects of severing the Route 18 bridge. Defendants have opposed the motion, arguing that (1) the Corps, as authorized by PL 85–500 has modified the project to allow the severance of the bridge, (2) plaintiffs are guilty of laches in waiting until the present to seek a preliminary injunction, and (3) the plaintiffs have not met the standards for a preliminary injunction in the Second Circuit.

## DISCUSSION

■ Laches is a doctrine of equity that is only rarely invoked in environmental cases because of the strong public interest in effecting compliance with NEPA. *Steubing v. Brinegar*, 511 F.2d 489, 495 (2d Cir.1975); *but see, City of Rochester v. U.S. Postal Service*, 541 F.2d 967, 977 (2d Cir.1976). I decline to invoke the laches

doctrine against the plaintiffs in this case. Plaintiffs can hardly be charged with sitting on their rights when the Corps has for years recommended the very outcome which plaintiffs now seek. The Corps only reached agreement with New York State to replace the bridge in April, 1983, and it only recently has become apparent that the existing bridge will be removed with no guarantee of replacement.

■ For a preliminary injunction motion to be granted, plaintiffs must demonstrate (a) irreparable injury, and (b) either (1) a likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly in their favor. *Jackson Dairy Inc. v. H.P. Hood and Sons Inc.,* 596 F.2d 70, 72 (2d Cir.1979). I believe that plaintiffs have demonstrated that immediate, irreparable harm will befall them if an injunction is not granted. The current Route 18 bridge must be severed, if only temporarily, in order that the Corps can complete the dredging of the channel. Yet once the bridge is severed, there is no guarantee that a replacement bridge will be built. Until there is such a guarantee, that is, until the New York State Legislature (or the County of Monroe) actually appropriates funds for a replacement bridge, the harm that the plaintiffs would suffer would continue. Plaintiffs will have to journey long distances to get from one side of the channel to the other, their various businesses would suffer, and emergency access to their properties would be curtailed.

■ In addition, I am convinced that plaintiffs have a likelihood of success on the merits of their action. PL 85–500, which authorized the Corps to complete the project with a bridge to be constructed by local interests, also authorized the Corps to make modifications in the project as described in HD 332. However, as set forth below, that authority to modify was exceeded when the Corps agreed to accept the new Route 104 bridge as a substitute for the bridge over the inlet.

Plaintiffs argue that this Court can order the enforcement of the Local Cooperation Agreement between the Corps and New York State, because such agreements are enforceable by this Court under 42 U.S.C. Section 1962d–5b. The Local Cooperation Agreement incorporates the language of HD 332 which requires construction of a 40-foot-high bridge over the channel. Defendants respond that the December 22, 1982 cover letter for the Local Cooperation Agreement contains the following statements by the Corps District Engineer:

> Please be advised that in view of the approved Phase II General Design Memoranda (GDM), Item (f) of the enclosed Agreement concerning bridge construction is totally a non-Federal responsibility. I emphasize this point because the decision to construct a movable bridge across the proposed channel is a local one. The actual navigation improvements are identical for severance or the movable bridge plan at the existing outlet to Irondequoit Bay. There has been opposition to severance of Route 18 due to disruption of local traffic. However, we believe that the opposition has come from a relatively local few. In the intervening year or two since our intensive public participation during development of the Phase I GDM, the local Governments have developed a land use and development plan for the project area. In view of this effort opposition to severance may have subsided and the ramp option (Paragraph 3, "Local Cooperation," pp. 3 and 4 of Phase II GDM) may be more acceptable. In any event, the Corps would accept either option since either would give unlimited clearance for navigation.

Defendants argue that this letter further reflects the understanding of the parties to the Agreement that the project had been modified during the early 1960's such that replacement of the bridge over the inlet was no longer required. Defendants argue that, because this is the intent of the parties to the Agreement, plaintiffs, who should not be considered third-party beneficiaries to the Agreement, cannot be heard

to argue that the Agreement should be enforced so as to require the construction of a bridge.

I am convinced that there has been a modification of the project as described in HD 332, of such serious dimensions that it amounts to an abandonment of the original purpose. The project as described in HD 332 clearly included a roadway bridge over the newly-dredged channel, and the construction of the Route 104 bridge 1½ miles to the south is no substitute for such a bridge; it carries the through traffic, and the ever-increasing local traffic still relies on the Route 18 bridge. To hold otherwise would be to allow would-be users of the bridge to become casualties of bureaucratic excessiveness—by condoning decisions which completely departed from original Congressional intentions. *Creppel v. U.S. Army Corps of Engineers*, 670 F.2d 564, 572 (5th Cir.1982). I hold that the Agreement between the Corps and the State is void and unenforceable since it undermines the intent expressed by Congress in P.L. 85–500. It is unnecessary to reach today the very troubling question whether this Court could actually enforce the Agreement against New York State under 42 U.S.C. Section 1962d–5b(c) if the Corps so desired. *See, Edelman v. Jordan*, 415 U.S. 651, 663, 666–67, 94 S.Ct. 1347, 1357, 39 L.Ed.2d 662 (1974). I hold today only that the Corps, having modified the project in violation of Congressional intent and having not complied with NEPA, cannot continue with its own project until those deficiencies are corrected.

■■■ After a thorough, probing, in-depth review, I am also convinced that the EIS prepared by the Corps is insufficient under NEPA. *Citizens to Preserve Overton Park Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Once an agency has made a decision subject to NEPA's procedural requirements, the only role for a Court is to insure that the agency has considered the environmental consequences; it cannot interject itself within the area of discretion of the executive as to the choice of the action to be taken.

*Strycker's Bay Neighborhood Council Inc. v. Karlen*, 444 U.S. 223, 227–28, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980). The flaw in the Corps decision-making process, however, is a procedural flaw, not an incorrect choice of alternatives. It has failed to analyze the impact of the severance alternative in anywhere near the level of detail with which it analyzed the alternatives of "no action", "construction of a fixed bridge", or "construction of a moveable bridge".

Alternative 3 considered by the Corps was the alternative of dredging the channel and severing Route 18. In the DEIS, it was presented on an equal footing with the other alternatives. Yet commenting on the DEIS, the Federal Highway Administration (FHWA) noted in an October 29, 1979 letter that:

> ... The costs to the traveling public of severence [sic] of the highway are not included for Alternative 3. These would include longer distance travel and delays. That alternative would also have some effects on community and Regional growth, tax revenue, and property value and those effects should be tabulated in pages 70–93. Emergency vehicle access limitation due to severence [sic] should also be discussed.

DEIS Appendix C, Section C2. This response evidently was passed along to the New York State Department of Transportation (NYSDOT), which attempted to respond in an August 13, 1980 letter. FEIS p. C2–41–1 *et seq.* The NYSDOT response thoroughly addressed the impacts of no action, a fixed bridge, and a moveable bridge, but *did not* address the impact of severance. Yet the Corps relied upon the NYSDOT letter as being responsive to some FHWA concerns which were later articulated in a June 18, 1980 letter. FEIS p. C6–5–2. The FEIS does *not* address the concerns of the FHWA's October 29, 1979 letter in its Comment/Response section (Appendix C6), nor were pages 70–93 of the DEIS revised in the FEIS (pp. 64–94) as the FHWA had recommended. In short, the FEIS suffers from the procedural flaw that it does not:

set[ ]forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives.

*County of Suffolk v. Secretary of the Interior,* 562 F.2d 1368, 1375 (2d Cir.1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978). Nowhere in the FEIS is the decision-maker advised of the environmental impacts which will occur if the bridge is severed and never replaced.

## CONCLUSION

The Corps is enjoined from removing the bridge across the inlet (Route 18) until assurances are received from "local interests" that it will be replaced as originally provided in Public Law 85–500. This does not mean that the Corps cannot do any of the other work involved such as dredging, etc. The Corps may remove the bridge however if it posts a bond in the amount of $5,000,000 to cover the replacement cost of a bridge over the inlet, pending any appeal of this decision so that the work may move along.

SO ORDERED.