Doris J. BRITT, Robert F. and Marjorie L. Gascon, Carl E. and Thelma V. Schenk, Ryal and Alice DeVoist, Gilbert Knapp, Nan Moody, Medicab of Rochester, Inc., Vic & Irv's Refreshment, Inc., and Alberta Enterprises, Inc., d/b/a Bill Gray's Family Restaurant, Plaintiffs-Appellees,

v.

UNITED STATES ARMY CORPS OF ENGINEERS, Jon O. Marsh, Secretary of the Army, Lt. Gen. E.R. Heiberg III, Chief of Engineers, United States Army Corps of Engineers, and United States of America, Defendants-Appellants.

No. 1433, Docket 85–6125.

United States Court of Appeals, Second Circuit.

Argued June 27, 1985.

Decided July 30, 1985.

Robert C. Napier, Rochester, N.Y. (David J. Seeger, Buffalo, N.Y., on the brief), for plaintiffs-appellees.

Albert M. Ferlo, Jr., Dept. of Justice, Washington, D.C. (F. Henry Habicht II, Asst. Atty. Gen., Washington, D.C., Salvatore R. Martoche, U.S. Atty., W.D.N.Y., Jonathan W. Feldman, Asst. U.S. Atty., Rochester, N.Y., Robert L. Klarquist, Dept. of Justice, Washington, D.C., on brief), for defendants-appellants.

Sutter, Summers & Lydon, Webster, N.Y., filed a brief on behalf of amicus curiae Town of Webster.

Before KEARSE and CARDAMONE, Circuit Judges, and WYATT, District Judge *.

KEARSE, Circuit Judge:

This expedited appeal is taken by defendants United States Army Corps of Engineers, *et al.* (collectively the "Corps"), from an order of the United States District Court for the Western District of New York, Michael A. Telesca, *Judge,* preliminarily enjoining the Corps from removing the bridge on New York Route 18 spanning the outlet channel from Irondequoit Bay (the "Bay") to Lake Ontario and linking the Town of Webster, New York, with Ironde-

quoit, New York (the "Bridge"), without receiving assurances from "local interests" that a replacement bridge will be built on that site. The Corps contends that the district court abused its discretion in granting the injunction. We agree and reverse.

## I. BACKGROUND

In 1958, Congress authorized the Corps to undertake an improvement project that included enlarging the existing channel connecting the Bay to Lake Ontario. River and Harbor Act of 1958, Pub.L. No. 85–500, § 101, 72 Stat. 297. The project was "authorized to be prosecuted under the direction of the Secretary of the Army and supervision of the Chief of Engineers, in accordance with the plans and subject to the conditions recommended by the Chief of Engineers in the ... report[ ] ... designated [H.R.Doc. No. 332, 84th Cong., 2d Sess. (1946) ("H.R.Doc. 332")]." *Id.* at 297. H.R.Doc. 332, labeled a "Preliminary Examination and Survey of Irondequoit Bay," included a report of the Chief of Engineers, dated April 15, 1955, recommending, *inter alia,* that

the [project] be subject to the condition that responsible local agencies give assurances satisfactory to the Secretary of the Army that without cost to the United States they will—

. . . .

(f) Replace and relocate the existing highway bridge with a new structure providing a vertical clearance of 40 feet above low-water datum in a location consistent with the recommended plan of improvement, in accordance with plans approved by the Chief of Engineers ....

H.R.Doc. 332, at 30. That document further stated that its recommendations were "all generally in accordance with the plans of the district engineer and with such modifications thereof as in the discretion of the Chief of Engineers may be advisable." *Id.* at 3, 4; *see id.* at 29.

* Honorable Inzer B. Wyatt, Senior Judge, Southern District of New York, sitting by designation.

In 1960, New York State proposed that, rather than replace the Bridge at its current site, it would construct a new high-level bridge over the Bay on New York Route 104, 1½ miles south of the Bridge and "abandon present Route 18 along the shore of Lake Ontario as a State highway route." The Office of the Chief of Engineers approved this proposal, stating that "the proposed deviations from the project document plan are satisfactory ...." The new high-level bridge was completed in 1970.

In 1979, the Corps published a Draft Environmental Impact Statement ("DEIS") and a draft Phase I General Design Memorandum with respect to the project and circulated it for public review and comment. In 1980, after conducting a hearing under § 404 of the Clean Water Act, 33 U.S.C. § 1344 (1982), the Corps published its Final Environmental Impact Statement on the project ("FEIS") and a final Phase I General Design Memorandum ("GDM–1"). Both the FEIS and GDM–1 noted that the question of whether a new bridge should be constructed on the site of the Bridge was a "local decision" and that the Corps would proceed with the project regardless of what that local decision was. In 1982, the Corps issued a Phase II General Design Memorandum, addressing the final design of the project and reaffirming that local interests would be free to construct a movable bridge or no bridge on the site. In 1983, a "Local Cooperation Agreement" was signed by the Corps and the State, which provided that the State would construct and maintain a replacement highway bridge across the expanded channel. In a covering letter from the Corps to the State, however, the Corps again asserted that the question of whether or not to construct a new bridge was entirely "a local one" and that the Corps "would accept either option."

In June 1984, the Corps awarded a contract for the enlargement of the channel and the construction of a small boat harbor at Irondequoit Bay, at a price of $3,260,000. The contractor began work in August 1984 and approximately one-third of the contract price has now been paid. Although the Bridge has not been removed, work under the contract is approximately 35% complete and is scheduled for completion by mid-September 1985.

In October 1984, plaintiffs, residents of Webster and owners of property near the Bridge, commenced the present action under, *inter alia*, the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (1982), and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 *et seq.* (1982). Plaintiffs claimed, *inter alia*, (1) that the Corps's approval of the Route 104 bridge as a replacement for the Bridge was a modification of the original proposal in H.R.Doc. 332 that was arbitrary and capricious and in excess of the authority of the Chief of Engineers, and (2) that the Corps's environmental impact statements did not adequately explore the effects of removing the Bridge. Based on these claims, plaintiffs moved for a preliminary injunction prohibiting the Corps from removing the Bridge until assurances were received that a new bridge would be constructed over the channel.

The district court granted the injunction, agreeing with both of plaintiffs' claims. In a Decision and Order dated April 12, 1985, 606 F.Supp. 536 ("Decision"), the court stated that

> there has been a modification of the project as described in HD 332, of such serious dimensions that it amounts to an abandonment of the original purpose. The project as described in HD 332 clearly included a roadway bridge over the newly-dredged channel, and the construction of the Route 104 bridge 1½ miles to the south is no substitute for such a bridge; it carries the through traffic, and the ever-increasing local traffic still relies on the Route 18 bridge. To hold otherwise would be to allow would-be users of the [B]ridge to become casualties of bureaucratic excessiveness—by condoning decisions which completely departed from original Congressional intentions.

*Id.* at 540. As to the NEPA claim, the court found that the Corps

> ha[d] failed to analyze the impact of the severance alternative in anywhere near the level of detail with which it analyzed the alternatives of "no action", "construction of a fixed bridge", or "construction of a moveable bridge,"

*id.,* and that "[n]owhere in the FEIS is the decision-maker advised of the environmental impacts which will occur if the [B]ridge is severed and never replaced," *id.* at 10.

Finding also that the removal and nonreplacement of the Bridge would cause plaintiffs irreparable injury and that they had not unduly delayed in commencing their suit, the court enjoined the Corps from removing the Bridge "until assurances are received from 'local interests' that it will be replaced as originally provided in Public Law 85–500." *Id.* This appeal followed.

## II. DISCUSSION

On appeal, the Corps argues that the district court abused its discretion in granting the injunction because (1) plaintiffs' suit should be barred by laches, (2) plaintiffs have not shown irreparable injury, and (3) plaintiffs have not shown either a likelihood of success on the merits or a sufficiently serious ground for litigation of either of their claims. While we decline to consider the question of laches, in light of the Corps's failure to plead it as an affirmative defense, *see United States v. One (1) 1963, Hatteras Yacht Ann Marie,* 584 F.2d 72, 76 (5th Cir.1978); Fed.R.Civ.P. 8(c) and 12(b), and while we agree with the district court that plaintiffs have adequately established the likelihood of irreparable harm to themselves as a result of the delay and inconvenience they will experience in traveling from one side of the channel to the other if the Bridge is removed, we agree with the Corps's third contention and accordingly reverse.

The standard in this Circuit for the issuance of a preliminary injunction requires the moving party to establish (1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) a sufficiently serious ground for litigation and a balance of hardships tipping decidedly in its favor. *E.g., In re Feit & Drexler, Inc.,* 760 F.2d 406, 415 (2d Cir.1985); *Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir.1984); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam). The ultimate question on appellate review of a district court's issuance of a preliminary injunction is whether, in light of the applicable standard, the court has abused its discretion. *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975); *Mitchell v. Cuomo,* 748 F.2d at 806; *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 206 (2d Cir.1979). Since, in our view, plaintiffs demonstrated neither a probability of success on the merits nor a sufficiently serious ground for litigation of either of the claims on which their motion was based, we conclude that the district court abused its discretion in granting the injunction.

### A. *The Project Modification Claim*

The district court found first that plaintiffs were likely to succeed on their claims that the Chief of Engineers had acted arbitrarily and capriciously and in excess of his authority in permitting the substitution of the Route 104 bridge for a replacement bridge over the new channel as originally contemplated by H.R.Doc. 332. This holding was based on an unduly narrow interpretation of the discretion accorded the Chief of Engineers to make modifications in Congressionally approved harbor projects and cannot be sustained.

The Irondequoit Bay project was one of a series of projects approved by Congress in the River and Harbor Act of 1958. As with each of the other projects authorized in that Act, this project was "authorized to be prosecuted under the direction of the Secretary of the Army and the supervision of the Chief of Engineers, in accordance with the plans and subject to the conditions recommended by the Chief of Engineers in the respective reports hereinafter designated."

Pub.L. No. 85–500, § 101, 72 Stat. 297. H.R.Doc. 332, the report designated for the Bay project, *id.* at 299, was entitled a *"Preliminary* Examination and Survey" and stated that its recommendations were "all generally in accordance with the plans of the district engineer and *with such modifications thereof as in the discretion of the Chief of Engineers may be advisable."* H.R.Doc. 332, at 3, 4 (emphasis added). Thus, in authorizing implementation of the Bay project "in accordance with" H.R.Doc. 332, Congress gave the Chief of Engineers considerable discretion to approve modifications of the project. The granting of such discretion was in accordance with Congress's usual practice, and should be honored by the courts.

■ "It has long been the custom of Congress to approve projects of this nature on the basis of such preliminary plans and to authorize the Chief of Engineers to make such modifications as later studies indicate are necessary." *United States v. 2,606.84 Acres of Land,* 432 F.2d 1286, 1292 (5th Cir.1970), *cert. denied,* 402 U.S. 916, 91 S.Ct. 1368, 28 L.Ed.2d 658 (1971); *see United States v. 255.25 Acres of Land,* 712 F.2d 1263, 1266 (8th Cir.1983); *Creppel v. United States Army Corps of Engineers,* 670 F.2d 564, 572 (5th Cir.1982). The reports with reference to which such projects are adopted are "never intended to be the final plans for the ... project," *United States v. 2,606.84 Acres of Land,* 432 F.2d at 1292, but are merely "planning document[s] that explore[ ] in general rather than detailed terms the feasibility of the engineering and economic aspects of the Project," *United States v. 255.25 Acres of Land,* 712 F.2d at 1266. As the Fifth Circuit has noted, "[i]t imparts both stupidity and impracticality to Congress to conclude that the [authorizing] statute impliedly forbids any change in a project once approved, and thus prevents the agency official from providing for the unforeseen or the unforeseeable ...." *Creppel v. United States Army Corps of Engineers,* 670 F.2d at 572. Accordingly, that court has concluded that "[e]ven when [the] project's purpose is authorized by Congress, the executive officer charged with responsibility for the project may modify it[ ] ... unless this action is *so foreign to the original purpose as to be arbitrary or capricious." Id.* (footnote omitted; emphasis added); *see United States v. 2,606.84 Acres of Land,* 432 F.2d at 1293; *United States ex rel. Chapman v. FPC,* 191 F.2d 796, 807 (4th Cir.1951), *aff'd,* 345 U.S. 153, 73 S.Ct. 609, 97 L.Ed. 918 (1953); *Ryan v. Chicago, B. & Q.R. Co.,* 59 F.2d 137, 142 (7th Cir.1932).

■ We find the reasoning of these cases eminently sound. Particularly in a situation such as is presented here, where more than twenty-five years have elapsed between the Congressional authorization and the actual implementation of the project, it would be unreasonable to impute to Congress the intent to preclude the Chief of Engineers from making reasonable modifications in the project to accommodate intervening developments in the economic, social, ecological, or political climate. Accordingly, we conclude that modifications by the Chief of Engineers in a project such as this are within the scope of his authority unless they are so foreign to the original purpose of the project as to be arbitrary and capricious.

■ In the present case, we conclude that plaintiffs have not met their burden of showing either likelihood of success on the merits or a sufficiently serious ground for litigation of their claim that the Chief of Engineers's approval of the Route 104 bridge was "foreign to the original purpose" of the project. The Corps contends that the sole purposes of the local assurance requirement were to ensure that any replacement for the Bridge would not hamper use of the new channel and that the expense of a replacement would not be borne by the federal government. Plaintiffs, while acknowledging these to be among the purposes of the requirement, contend that a further purpose was to preserve through-traffic on Route 18. In light of the preliminary nature of the plans outlined in H.R.Doc. 332, we think it unlikely

that Congress had that specific purpose. Route 18 is not mentioned in H.R.Doc. 332, and if Congress's intent in adopting the Bay project included consideration of the effects on automobile traffic across the Bay, it is likely that that intention was no more specific than that such traffic not be unduly disrupted. Assuming such an intent, plaintiffs are highly unlikely, for several reasons, to be able to show that the substitution of the Route 104 bridge was foreign to that intent.

First, we note that H.R.Doc. 332 recommended that assurances be obtained that local interests would "[r]eplace and *relocate*" the Bridge. H.R.Doc. 332, at 30 (emphasis added). Thus, H.R.Doc. 332 itself appears to contemplate that the replacement for the Bridge might be located at a different site than that occupied by the Bridge, and the district court's view that the approval of the Route 104 bridge, 1½ miles south of the Bridge, was a "complete[ ] depart[ure]" from the original Congressional intent seems unwarranted. Further, although automobile traffic between some points is less convenient over the Route 104 bridge than over the Bridge, any placement of a bridge will be more convenient to some than to others. The greatest additional distance that use of the Route 104 bridge will require is 10 miles. For most travelers, the increase in distance will be less; and, of course, the Route 104 bridge has shortened the travel distance for many. Thus, the substitution of the Route 104 bridge for the Bridge appears generally to serve the purpose of facilitating automobile traffic across the northern end of the Bay, and its substitution for a new bridge on the precise site of the existing Bridge does not appear to be foreign to the original purpose of the project. Finally, given the broad discretion expressly granted to the Chief of Engineers to adopt modifications to the project, his approval of the substitution hardly appears to have been arbitrary or capricious.

In sum, plaintiffs' claim that the approval of the Route 104 bridge as a substitute violated the Administrative Procedure Act is too insubstantial to support the granting of a preliminary injunction.

**B.** *The Environmental-Impact-Statement Claim*

As a second ground for preliminarily enjoining the Corps from removing the Bridge, the district court held that plaintiffs had shown a likelihood of success on the merits of their claim that the DEIS and FEIS did not adequately explore the effects of severing the Bridge without obtaining prior assurances of its replacement. Again we disagree.

By its enactment of NEPA, Congress has required all federal agencies to "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on . . . the environmental impact of the proposed action." 42 U.S.C. § 4332(C)(i) (1982). An agency charged with preparing such an environmental impact statement ("EIS") must demonstrate that it has taken a " 'hard look' at [the] environmental consequences" of the project. *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976). Where the agency has failed to take such a hard look, a court may enjoin it from pursuing the project until an appropriate EIS is prepared. *Sierra Club v. United States Army Corps of Engineers,* 701 F.2d 1011, 1030–31 (2d Cir.1983); *Chelsea Neighborhood Association v. United States Postal Service,* 516 F.2d 378, 387–89 (2d Cir.1975). The responsibility of a reviewing court under NEPA is only to "satisfy itself that the correct procedures have been followed [by the agency] in arriving at the decision under review," *Monroe County Conservation Council v. Adams,* 566 F.2d 419, 422 (2d Cir.1977), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978); the court "cannot ' "interject itself within the area of discretion of the executive as to the choice of the action to be taken," ' " *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227–28, 100

S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980) (per curiam) (quoting *Kleppe v. Sierra Club*, 427 U.S. at 410 n. 21, 96 S.Ct. at 2730 n. 21 (quoting *Natural Resources Defense Council v. Morton*, 458 F.2d 827, 838 (D.C. Cir.1972) (footnote omitted))).

Plaintiffs alleged, and the district court held, that "[n]owhere in the FEIS is the decision-maker advised of the environmental impacts which will occur if the bridge is severed and never replaced." This conclusion is insupportable. The FEIS discusses numerous environmental effects of removing and not replacing the Bridge, including the cost of rerouting traffic (FEIS at 3); the effects on development (*id.* at 42, 44–45); the effects on property values, property tax revenues, and the cost of public services (*id.* at 46); and the effect on sales tax revenues (*id.* at 47). Further, GDM–1, which was attached to the FEIS, extensively discusses the impact of bridge removal without replacement, covering the effects on, *inter alia*, topography, sediment quality, air quality, water quality, fisheries, flooding, noise, displacement of people, community growth, recreational resources, and transportation. (GDM–1, at 65–B to 88.)

■ Plaintiffs contend that despite this extensive discussion of the severance alternative in the FEIS and GDM–1, the FEIS was nevertheless deficient because it failed to quantify the dollar value of the impact on traffic problems entailed by adoption of that alternative. NEPA, however, does not require that all impacts be discussed in exhaustive detail but only that the EIS furnish such information as appears to be reasonably necessary under the circumstances for the evaluation of the project. *See County of Suffolk v. Secretary of the Interior*, 562 F.2d 1368, 1374–78 (2d Cir. 1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978); *Natural Resources Defense Council v. Callaway*, 524 F.2d 79, 88 (2d Cir.1975); *see also Citizens for Balanced Environment and Transportation, Inc. v. Volpe*, 650 F.2d 455, 460 (2d Cir.1981). The FEIS concludes that if the Bridge were permanently removed,

"highway traffic could be rerouted without any significant monetary disbenefits." (FEIS at 3.) While plaintiffs have complained of their own not insignificant personal inconvenience, they have offered no evidence that this conclusion as to the overall economic "disbenefits" to the region was reached after inadequate consideration, and the record before us, including the FEIS and GDM–1 discussions cited above, does not suggest that plaintiffs are likely to prove that the Corps did not consider all of the environmental factors involved.

■ In sum, we conclude that the district court erred in holding that plaintiffs had shown a likelihood of success on the merits of their claim that the DEIS and FEIS did not reflect adequate consideration by the Corps of the impact of removing and not replacing the bridge.

CONCLUSION

Since plaintiffs showed neither a likelihood of success on the merits nor a sufficiently serious ground for litigation of either of the claims on which their preliminary injunction motion was based, we conclude that the district court abused its discretion in granting the injunction. The order granting the preliminary injunction is reversed.

CARDAMONE, Circuit Judge, dissenting:

Principally for the reasons set forth in Judge Telesca's thorough opinion,—F. Supp.—(W.D.N.Y.1984), I respectfully dissent with these additional comments.

When Congress allocated the funds for the Irondequoit Bay Project it left to local authorities the decision as to what type of bridge should replace the Route 18 bridge. House Document 332 specifically stated that the project was to be *"subject to the condition* that responsible local agencies give assurances ... that ... they will ... [r]eplace and relocate the existing highway bridge."* H.R.Doc. 332, at 30 (emphasis added). Thus, building a replacement

bridge was a condition precedent to the construction of the project. According to the majority opinion, the Corps acted properly within its discretion to modify the plans for the project when it decided that the Route 104 bridge would satisfy the "local interests" requirement that Congress imposed. I disagree for several reasons.

First, there is insufficient evidence in the record to support a conclusion that the New York State legislature or any local agency considers the Route 104 bridge as a substitute for the Route 18 bridge. Although there may have been some discussion of that subject years ago in 1960 when New York appropriated funds for the Route 104 bridge, the 1983 "Local Cooperation Agreement," by which the State agreed that it would construct a replacement bridge, clearly reveals that the State and the Corps understood that the State had an outstanding obligation to provide a replacement.

Second, examining the Corps' position compels me to conclude that it either arbitrarily deleted from the enabling legislation the precondition that there be a local decision on what bridge service would be adequate for the local communities affected, or else it determined that it—like "Big Brother"—could decide for the local communities what would be in their best interests. Viewed in either light, the Corps' decision was plainly arbitrary and the project should be halted.

The Final Environmental Impact Statement and the Phase I General Design Memorandum both indicated that the Corps was leaving the decision of what to do about a replacement bridge to State and local authorities. That is well and good, except for the fact that it was Congress's clear intent that the local authorities reach their decision *before* the Route 18 bridge was destroyed. When Congress approved the project in 1958 the Route 18 bridge was much more important to the local community than it is today, as there was then no Route 104 bridge. It seems irrational to conclude that Congress could have planned at that time that the Corps could willy-nilly destroy the Route 18 bridge prior to a local decision on what would serve as an adequate substitute.

Further, it totally contradicts Congressional purpose to say, as does the majority, that the Corps acted within its discretion to modify the terms of the project when it concluded that the Route 104 bridge would serve as a replacement bridge over the new channel. Allowing the Corps to so modify the project is to allow the Corps' engineers to exercise their judgment as to what is and what is not in the best interests of the community. Congress never intended that such an important local decision be left to the Corps, since the Corps' principal concern is a water project to improve the area's recreational navigation, not the community's need for a bridge. Allowing the Corps to substitute its judgment for the judgment of local ·elected authorities is beyond the scope of its discretion and constitutes an action that is "so foreign to the original purpose as to be arbitrary or capricious." *Creppel v. United States Army Corps of Engineers*, 670 F.2d 564, 572 (5th Cir.1982).

The cases that the majority cites all deal with modifications of the construction details of Corps projects and not with decisions that, like the present one, have a profound effect on local interests. For example, *United States v. 255.25 Acres of Land*, 712 F.2d 1263 (8th Cir.1983), involved the Corps' decision to take land from a private landowner in order to construct a dam and reservoir. The Corps' decision was based on its determination that in order to build the dam it was necessary to acquire property 621 feet above mean sea level. And in *Creppel*, 670 F.2d 564, the court held that the Corps' decisions to modify a flood control project were within its discretion. The decisions at issue related to engineering details of the project and were reached after extensive consideration and study. *See also United States v. 2,606.84 Acres of Land*, 432 F.2d 1286 (5th Cir.1970), *cert. denied*, 402 U.S. 916, 91 S.Ct. 1368, 28 L.Ed.2d 658 (1971) (decision to take private property necessary to complete dam project within Corps' discretion); *United States ex rel. Chapman v. FPC*,

191 F.2d 796 (4th Cir.), *aff'd,* 345 U.S. 153, 73 S.Ct. 609, 97 L.Ed. 918 (1953) (decision to change location and elevation of dam within FPC's discretion); *Ryan v. Chicago, B. & Q.R. Co.,* 59 F.2d 137 (7th Cir.1932) (decision to increase size of dam project within discretion of Corps). The decision that the Corps has made in the present case is one dependent upon the actions of local agencies, not one solely within the professional expertise of the Corps. While the Corps has broad discretion to modify more technical decisions relating to details such as size, location, and elevation of its projects, it has no ·authority to make a decision in an area where Congress expressed its desire to have local interests play a critical role.

I vote therefore to affirm the decision of the district court enjoining the Corps from removing the Route 18 bridge, until assurances are received from "local interests" that it will be replaced.