**David STOW and Joyce Stow, Barbara Ottey and Charles Ottey, Plaintiffs,**

**v.**

**UNITED STATES of America, on Behalf of the SOIL CONSERVATION SERVICE OF the UNITED STATES DEPARTMENT OF AGRICULTURE, the United States Army Corps of Engineers, and the Federal Highway Administration of the United States Department of Transportation, and the County of Chemung, Defendants,**

**and**

**New York State Department of Transportation, Defendant–Intervenor.**

No. Civ. 88–697L.

United States Distict Court.
W.D. New York.

Oct. 6, 1988.

---

John F. Vorrasi, Rochester, N.Y., for plaintiffs.

Frederick C. Emery, Jr., Asst. U.S. Atty., Rochester, N.Y., John F. O'Mara, Elmira, N.Y., Francis J. Keehan, Asst. Atty. Gen., N.Y. State Dept. of Law, Albany, N.Y., for defendants.

## DECISION AND ORDER

LARIMER, District Judge.

Mark Twain commented that: "In all matters of opinion our adversaries are insane." *Mark Twain at Your Fingertips*, (Caroline T. Harnsberger ed.).

This action involves alleged violations of, *inter alia*, the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, by federal agencies who approved the construction of an earthen dam and the relocation of a state highway in Sullivanville, New York. In essence this case was com-

menced because some members of communities surrounding Elmira, New York disagree with the opinion and judgment of the several federal, state, and local governments concerning construction of this project to eliminate the perennial flooding in the area. Plaintiffs seek to do here in court what they have failed to do over at least the past ten years, that is, to stop the project or change it to their liking.

The vehicle that plaintiffs seek to use here is NEPA. They claim that because the federal agencies failed to follow NEPA, the project should be stopped. On the contrary, this case is a testament to the effectiveness of NEPA. Because of the input of the public and because of the agencies' review, many aspects of this project were either changed or eliminated.

The court certainly understands that men and women of good intention might differ concerning the wisdom of portions of this project. But differences of opinion do not create a violation of NEPA.

Because the court believes that it should not substitute its judgment and opinion for that of the federal and state executive and legislative agencies involved and because those agencies complied with the requirements of NEPA, plaintiffs' claims and their challenge to the project must fail. For the reasons discussed below, plaintiffs' motion for a preliminary injunction is denied, and defendants' motions for summary judgment are granted.

### Background

Plaintiffs commenced this action in June 1988, on behalf of themselves and others similarly situated, against defendants United States Department of Agriculture, Soil Conservation Service (SCS), United States Army Corps of Engineers (Corps), United States Department of Transportation, Federal Highway Administration (FHWA) (collectively, the federal defendants), and the County of Chemung, New York (County). By stipulation of the parties, the New York State Department of Transportation (DOT) has intervened as a defendant in the action. The defendant federal, state and local agencies were responsible for the planning,

approval, and funding of the construction of the 12E Dam at Sullivanville, New York (12E Dam) and the attendant relocation of New York State Route 13.

Plaintiffs seek review of the agencies' decisions and actions, pursuant to NEPA and the Administrative Procedure Act (APA), 5 U.S.C. §§ 702, 704. They claim, *inter alia,* that the agencies did not comply with Section 102 of NEPA, 42 U.S.C. § 4332, and the regulations thereunder, requiring the preparation of an environmental impact statement before approving the Dam and highway relocation projects. In particular, they allege that the defendants did not comply with NEPA's requirements because "material and vital" information, such as data concerning the relocation of Route 13, geological data concerning the 12E Dam site, and reasonable alternatives to the 12E Dam, was omitted from the draft and final environmental impact statements. Plaintiffs also allege that the projects' benefit-cost ratio was improperly calculated, and that the benefits do not exceed costs as required by federal law governing watershed projects.

Plaintiffs seek, *inter alia,* to: (1) preliminarily and permanently enjoin further construction and other activities related to the completion of the 12E Dam and relocation of Route 13; (2) restore privately-owned lands that were taken or damaged in effectuating the projects; and (3) recover damages incurred by class members.

Plaintiffs are homeowners who live near the site where the 12E Dam is being built. The 70 feet high, Class C, earthfill dam is designed to protect the city of Elmira, New York and surrounding communities from flooding by Newton Creek. The 12E Dam is a component of the Newton–Hoffman Creeks Watershed Project (Watershed Project) that was formulated in 1967 by agencies of the federal, state and local governments. It is one of several floodwater retarding structures (dams) that are a part of the Watershed Project.

The Newton–Hoffman Creeks Watershed is located in Chemung and Schuyler Counties, New York. The Watershed Project was implemented through the assistance of

860

defendant SCS, pursuant to the Watershed Protection and Flood Prevention Act, Pub. L. 83–566, as amended, 16 U.S.C. §§ 1001–1008. The sponsors of the Watershed Project include the Chemung County Board of Supervisors, the Chemung County Soil and Water Conservation District, the Schuyler County Soil and Water Conservation District and the New York State Department of Environmental Conservation (DEC). In 1968, the sponsors of the Watershed Project signed a Work Plan Agreement for the implementation of the Project. The original Plan provided for the construction of six floodwater retarding structures, one multi-purpose floodwater retarding/recreation structure, one debris basin, additional diking and dike reinforcement, channel improvement of Newton, Hoffman and Diven Creeks and a pump plant on Diven Creek. By 1979, the multi-purpose floodwater retarding/recreation structure, two dams and the pump plant had been completed.

The Watershed Project was formulated, and its implementation began, prior to the enactment of NEPA in 1969. Defendant SCS is the lead agency responsible for planning, approving and constructing the various increments of the Project. In planning further work on the Project, the SCS determined that the construction of remaining Project increments must be in compliance with NEPA procedures. In light of its duties under NEPA and in an effort to update information regarding the Watershed Project, in 1978, the SCS undertook a reassessment of the environmental, economic and engineering viability of the various remaining construction increments. The results of the reassessment were presented at a public meeting on the Watershed Project in May 1979. After a series of meetings between the SCS, the sponsors and interested groups to discuss the SCS' reassessment of the viability of the Watershed Project as originally planned, the sponsors decided to proceed with the Project, but with considerable modifications. All remaining increments of the Watershed Project, except the construction of three dams, were deleted.

In accordance with NEPA, in December 1980, the SCS issued a formal draft environmental impact statement (DEIS or draft report) which evaluated the impacts of the construction of dams at sites 12E, 5A, and 2. The DEIS presented four alternatives for flood protection in terms of the needs of the communities affected. Alternative 2 which provided for the construction of the three dams only was determined to be the best alternative to effectuate the Watershed Project's objectives. The draft report also summarily noted that a portion of state highway Route 13 would be relocated in conjunction with the construction of the 12E Dam. The DEIS evaluated the environmental, economic and social impacts of Alternative 2. It concluded that there were no significant biological and ecological impacts associated with that alternative. However, the report noted that the construction of the 12E Dam had spawned considerable controversy and that some residents living downstream of Site 12E had voiced concern regarding the dam's safety.

The DEIS was circulated for public review and comment. Numerous agencies, citizens' groups and individuals submitted written comments to the SCS concerning the adequacy of the DEIS and the propriety of the subject projects. Most of the commentary on the DEIS noted the absence of a detailed analysis of the impact of the relocation of Route 13 and the need for greater elaboration on Alternative 3—nonstructural measures, including property acquisition, relocation, floodproofing and a flood warning system—which had been rejected. There was also an inquiry regarding the extent of the SCS' consideration of the alternative of removing fill from Newton Creek. While this alternative was not addressed separately in the DEIS, it was a component of Alternative 1 which included channel improvement of Newton, Hoffman and Divens Creeks. The SCS responded to these comments and inquiries, providing explanations and additional information as required.

A public hearing regarding the DEIS was held on May 27, 1981. Representatives of the SCS, the DOT and the DEC

made brief presentations concerning the historic flooding problems of the area and the need to implement some remaining increments of the Watershed Project. The DEC spokesman noted that the floodwater retention capacity of Newton Creek had been greatly reduced because of fill that had been placed in the Creek over a 15-year period and that this area of the Creek had undergone some development. The DOT spokesman presented considerable information concerning the relocation of Route 13, including a summary of the findings and conclusions of its 1978 report, which was referenced in the DEIS, regarding the environmental and other impacts of the project.

Based on the public input at the hearing and numerous letters concerning the DEIS from various government agencies and the public, the sponsors further reduced the scope of the Watershed Project. In August 1983, the SCS issued a final environmental impact statement (FEIS or final report) which evaluated the impacts of construction of the 12E and 5A dams only, and the relocation of state Route 13. The dam at site 2 was completely eliminated. The FEIS analyzed the various alternatives, and the environmental, economic and social impacts of the selected plan, Alternative 2. That report concluded that the only adverse environmental consequences of Alternative 2 were the elimination of 10.1 acres of prime farmland, the relocation of seven families, increased anxiety concerning the possibility of dam failure, and the periodic inundation of 57 acres of prime farmland. The FEIS contains a detailed discussion of the environmental and other impacts of the relocation of Route 13.

On January 26, 1984, the SCS issued a Record of Decision (ROD) approving and proposing completion of the implementation of the Watershed Project as stated in the FEIS. Nearly four years later, Chemung County applied for a permit pursuant to Section 404 of the Clean Water Act for construction of the 12E Dam. After giving notice of the County's permit application, the Corps conducted a public hearing on that application. Based on its own assessment of the impacts of the proposed dam construction, the Corps determined that the final proposal for the project would not have a significant individual or cumulative impact on the environment nor would it contravene the public interest. In November 1987, the Corps issued the 404 permit to build the 12E Dam.

Construction of the Dam and the relocation of Route 13 began during the first week in May 1988. As of August 1988, construction of the Dam was approximately 31% completed with an expenditure of $1.5 million of the total estimated cost of $4.7 million, and approximately 50% of the work in relocating Route 13 had been completed.

Plaintiffs now seek to vacate the agency actions with respect to the Watershed Project and to enjoin any further work on the Project. Defendants advance the following grounds in opposition to plaintiffs' motion and in support of their motions for summary judgment: (1) that none of the plaintiffs has standing to bring and maintain this action, (2) that plaintiffs are barred by the equitable doctrine of laches from maintaining this action, (3) that plaintiffs have not shown irreparable harm and a likelihood of success on the merits, and (4) that the defendant agencies have fully complied with NEPA's procedural mandates in approving the construction of the remaining increments of the Project and the relocation of Route 13.

### Standing

■ The federal defendants argue that neither the Stows nor the Otteys owns land that was the subject of condemnation in connection with the Dam and relocation projects or land that is near or would be affected by the Dam. They claim that plaintiffs' properties are located outside the area which will benefit from the dam and outside the area which would be at risk in the event of dam failure. Affidavit of Joseph Delvecchio, sworn to August 18, 1988, at ¶¶ 5, 6. Therefore, defendants contend that plaintiffs do not have standing to maintain this action.

In order to establish standing to obtain judicial review of an agency's action pursuant to Section 10 of the APA, 5 U.S.C. § 702, plaintiffs must show "that the challenged action ha[s] caused them 'injury in fact,' and ... the alleged injury was to an interest 'arguably within the zone of interests to be protected or regulated' by the statutes that the agencies [are] claimed to have violated." *United States v. SCRAP*, 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973) (*quoting Sierra Club v. Morton*, 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972)). A party seeking judicial review must allege that "he has been or will in fact be perceptibly harmed by the challenged agency action." *Id.* 412 U.S. at 688, 93 S.Ct. at 2416. "Injury in fact" is not limited to economic harm; injury to aesthetic and environmental interests is also sufficient to confer standing. *Sierra Club v. Morton*, 405 U.S. at 734, 92 S.Ct. at 2440.

The court agrees with defendants that a mere interest in the "problem" is not sufficient to render an individual "adversely affected" or "aggrieved," within the meaning of the APA. However, defendants' application of the standing test is much too narrow. Standing to challenge the violations of federal environmental laws alleged in this case is not confined to those who own land that is located in the flood "inundation" area. Persons with other economic, aesthetic, environmental, or conservational interests may have a direct stake in the agency action approving and implementing this increment of the Watershed Project.

Plaintiffs here have alleged more than a mere interest in the problem. The complaint alleges that plaintiffs are property owners who reside below the 12E Dam site, that their water supply may be adversely affected by the construction of the Dam and that they are at risk in the event the Dam fails. Plaintiffs also allege that they will be subjected to noise and air pollution and that the aesthetics of the surrounding area will be adversely affected by the construction of the Dam and the relocation of Route 13. These allegations satisfy the "injury in fact" requirement. Further, the alleged injury is to interests that are within the zone of interests protected by NEPA. Based on the allegations, the court cannot say that plaintiffs only interest is to vindicate their own personal preferences. If the allegations are proved, plaintiffs would be among the persons injured by the challenged agency action.[1]

### Laches

All defendants have raised the defense of laches as a bar to injunctive relief. They contend that the court should apply the doctrine of laches to bar plaintiffs' maintenance of this action because plaintiffs admit that they have known all along about the allegedly "fraudulent" and unlawful actions by the administrative agencies involved, but did not timely seek judicial review of those actions. Defendants claim that the federal, state and local governments are parties to binding contracts, and that any breach of these contracts will impose a financial hardship on the respective governments, and their taxpayers. The County has also expended funds for condemnation and acquisition of property for use in the projects.

The court agrees with the defendants that plaintiffs have not been diligent in seeking judicial review of agency action which they have been aware of since it was initially proposed and which they have repeatedly claimed was ill-considered and illegal. In her affidavit, plaintiff Barbara Gilman–Ottey states that she has "appeared at every step in the [administrative] proceedings and carefully outlined the incidents of fraud and deception that provide the basis for the documents and decisions in question." Affidavit of Barbara Gil-

---

**1.** Having determined that plaintiffs have sufficient property and other interests to satisfy the standing requirement with respect to their claims of violations of NEPA and other federal environmental laws on which they rely, the court need not address defendants' contention that plaintiffs cannot claim standing as taxpayers or class members. However, plaintiffs have not established that they have standing to pursue their Fifth Amendment claim. *See* n. 6 *infra.*

man–Ottey, sworn to July 11, 1988 at p. 12, ¶ 23. The essential grounds for plaintiffs' claims of violations of NEPA are that the draft and final environmental impact statements are inadequate. Yet, plaintiffs did not initiate an action to obtain judicial review of those documents to insure the responsible agencies' compliance with NEPA until nearly two months after the construction work had begun and almost *five years* after the FEIS was issued and seven months after the 404 permit was issued. It is, of course, the alleged deficiencies in the FEIS that are at the heart of plaintiffs' complaint.

Although application of the laches doctrine in environmental cases is disfavored in this circuit, given the strong public interest in effecting compliance with NEPA, *Steubing v. Brinegar*, 511 F.2d 489, 495 (2d Cir.1975), the court finds that plaintiffs' unreasonable delay and the substantial prejudice to defendants warrants application of the doctrine in this case. There is ample precedent for finding that plaintiffs have slept on their claims and that those claims are barred by laches. *See, e.g., City of Rochester v. United States Postal Service*, 541 F.2d 967 (2d Cir.1976); *Sierra Club v. Alexander*, 484 F.Supp. 455 (N.D. N.Y.1980), *aff'd*, 633 F.2d 206 (2d Cir.1980); *Clarke v. Volpe*, 342 F.Supp. 1324 (E.D. LA.), *aff'd*, 461 F.2d 1266 (5th Cir.1972).

The projects at issue here are in advance stages of construction. Many acres of land have been acquired for the projects with the adverse consequence of displacing seven families. Plaintiffs delayed even as these families' land was condemned and purchased. They delayed as contracts for construction were awarded. Construction of the 12E Dam and the relocation of Route 13 have progressed well beyond the preparatory stage. The clearing of trees and brush has irreversibly altered the landscape. Work on the Dam is 31% completed and the relocation work is 49% completed, with substantial irreversible expenditures of money and human effort.

This is not a case where plaintiffs as laypersons were not aware of the deficiencies alleged in the draft and final environmental reports at the time they were issued, and therefore, were not motivated to oppose the projects until they had a reasonable suspicion of non-compliance. *See I-291 Why? Association v. Burns*, 372 F.Supp. 223 (D.Conn.1974), *aff'd*, 517 F.2d 1077 (2d Cir.1975). The record is replete with evidence of plaintiff Barbara Gilman–Ottey's vociferous opposition to the construction of the remaining dam increments of the Watershed Project, particularly the 12E Dam. Her group has contacted numerous federal and state agencies, local and state legislators, public interest groups, and even the President of the United States, voicing their opposition to the proposed completion of the Project and alleging violations of federal law by the agencies responsible for the Project. *See* Gilman–Ottey Affidavit, Ex. A. At the hearing on the DEIS in May 1981, Mrs. Gilman–Ottey declared, for the SCS's benefit, that the meeting was illegal because the draft report did not comply with federal law.

In light of the significant degree of work that has been completed at substantial costs, the environmental changes to the area that have already occurred and the lack of merit of plaintiffs' claims, as discussed *infra*, the court finds that the injunctive relief plaintiffs seek would not serve the public interest and NEPA's purposes. The court further finds that the public interest in avoiding economic waste that would result from renegotiation or breach of the construction contracts outweighs the adverse environmental impacts, if any, that might occur if further construction is not enjoined.[2] Accordingly, the court concludes that plaintiffs' claims for relief are barred by laches.

Although this finding on laches is sufficient to dispose of the litigation, the court will also treat the merits of the case in the

---

**2.** Plaintiffs have not challenged defendant DOT's assertion that greater adverse environmental impacts will occur if the relocation of Route 13 is not completed as planned. The DOT claims that "the status quo of the area has been irrevocably altered and changed," and that in its present condition, the site would be subject to erosion, and drainage and wind damage.

interests of a complete record and in the interests of finally concluding the matter.

## Review under NEPA

Pursuant to NEPA, all federal agencies must:

> include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action ...

42 U.S.C. § 4332(C). The purpose of this provision is to force federal agencies to make decisions only after full information concerning environmental consequences has been well-considered.

Judicial review of agency action under NEPA is very limited. If there is a rational basis for the agency's decision, it must be upheld. *Sierra Club v. United States Army Corps of Engineers*, 772 F.2d 1043, 1050 (2d Cir.1985) (hereinafter cited as *Sierra Club II*). The purpose of judicial review is "to ensure that the agency has considered the environmental consequences of its proposed action.... To conform with NEPA, a reviewing court need only find that the agency considered the environmental consequences of its proposed actions.... If an agency decides that the economic or social benefits of a project outweigh its environmental costs, its choice must be affirmed so long as the procedural requirements of NEPA were followed, that is, environmental consequences were considered." *Id.* (citations omitted).

█ Thus, the narrow issue before this court is whether the defendant agencies have demonstrated that they have taken a "hard look" at the environmental consequences of the 12E Dam and Route 13 relocation projects. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976); *Britt v. United States Army Corp of Engineers*, 769 F.2d 84, 90 (2d Cir.1985). The duty of

the court is to satisfy itself that the federal agencies have followed the correct procedures in arriving at the decisions that are subject to review here. The court cannot "interject itself within the area of discretion of the executive as to the choice of the action to be taken." *Id.* (quoting *Strycker's Bay Neighborhood Council Inc. v. Karlen*, 444 U.S. 223, 227–28, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980)).

Further, this court "does not sit as a super-agency empowered to substitute its scientific expertise or testimony presented to it *de novo* for the evidence received and considered by the agency which prepared the EIS." *Sierra Club v. United States Army Corps of Engineers*, 701 F.2d 1011, 1029 (2d Cir.1983) (hereinafter cited as *Sierra Club I*). In light of the adequacy of the administrative record here, it is not the function of the court to conduct a *de novo* review. *Sierra Club II*, 772 F.2d at 1052.

The purpose of NEPA's requirement of an environmental impact statement is "to insure a fully informed and well-considered decision" by the responsible agency. *Sierra Club I*, 701 F.2d at 1029. The Second Circuit has articulated the requirements for environmental impact statements as follows:

> In order to fulfill its role, the EIS must set forth sufficient information for the general public to make an informed evaluation ..., and for the decisionmaker to "consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action".... In so doing, the EIS insures the integrity of the process of decision by giving assurance that stubborn problems or serious criticisms have not been "swept under the rug."

*Id.* (citations omitted).

The court's narrow task is merely to determine whether the agency has acted in "good faith" in compiling the EIS and whether the statement permits a decisionmaker to fully consider and balance the environmental factors. *Id.* at 1030. In light of the function of the environmental

impact statement and the narrow scope of judicial review, "the court may not rule an EIS inadequate if the agency has made an adequate compilation of relevant information, has analyzed it reasonably, has not ignored pertinent data, and has made disclosures to the public." *Id.* at 1029 (citation and footnote omitted); *see also Trout Unlimited v. Morton,* 509 F.2d 1276, 1286 (9th Cir.1974).

### Review under Clean Water Act

█ The scope of judicial review under the Clean Water Act differs slightly from that under NEPA. Rather than merely requiring that the agency evaluate environmental consequences of a project, the Act "specifically prohibits an agency from sanctioning a project that it finds will have a significant adverse impact on the marine environment." *Sierra Club II,* 772 F.2d at 1051. In reviewing the validity of the decision by the Corps to issue the 404 permit, this court must uphold that decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Sierra Club I,* 701 F.2d at 1032.

With these well-established guiding principles in mind, the court now addresses the merits of plaintiffs' contentions that the defendant agencies did not comply with federal laws in approving the construction of the 12E Dam and the relocation of Route 13.

### Disclosure of Route 13 Relocation

█ It is clear that the DEIS did not make adequate disclosure concerning the relocation of approximately 2.44 miles of Route 13. The federal and state Departments of Transportation and the DEC explicitly stated in their comments to the SCS concerning the draft report that it did not comply with NEPA because of its summary treatment of the highway relocation project. However, representatives of the DOT appeared at the public hearing on the

DEIS and presented adequate information concerning the relocation project. Clearly, the omission of data concerning the relocation of Route 13 was remedied in the FEIS which is exhaustive in its discussion of various alternatives the DOT considered in planning the highway relocation, the environmental, social and economic impacts of the project, and engineering considerations. Plaintiffs' arguments that the final report did not rectify the inadequacies of the draft report on this issue are meritless. The court finds that the public hearing on the DEIS and the FEIS provided a basis for an informed and well-considered decision on the relocation of Route 13, and therefore satisfied the NEPA mandate with respect to this aspect of the Watershed Project.[3]

### Dam Safety

Both the draft and final reports briefly discussed the soil composition at the 12E Dam site. The foundation for the structure was described as "glacial till and outwash." The reports concluded that the foundation has no "critical earthquake hazard," however, the characteristics of the foundation were to be considered in the final design of the embankment to minimize earthquake hazards to the structure. The FEIS also includes a letter from the SCS to plaintiff Gilman–Ottey, then Barbara Gilman, dated April 7, 1981, addressing the identical claims plaintiffs raise in this action. In response to plaintiff's concern about soil conditions at Site 12E, Paul A. Dodd of the SCS stated: "The Soil Conservation Service is aware of soil conditions at Site 12E. These soil conditions have been considered in planning designs. It has been concluded by SCS engineers that a dam meeting necessary safety standards can be constructed at Site 12E."

█ The draft and final reports lists anxiety concerning dam safety as one of the adverse environmental consequences of the project. Thus, it is clear that the SCS was

---

3. Plaintiffs allege that there has been "false information" regarding the circumstances requiring relocation of Route 13. They claim that the 12E Dam and not substandard road conditions as stated by the DOT led to the relocation effort. They allege that the DOT "fabricated" a report of road deterioration on Route 13 in order to qualify the relocation project for federal funding. The court finds no support for these allegations in the record.

aware of the public concern about the safety of the 12E Dam and made an informed judgment that the soil conditions at that site did not preclude the erection of a safe dam.

To support their allegations that a safe dam cannot be built at the 12E site, plaintiffs rely on an informal letter from Donald I. Siegel, a hydrologist at Syracuse University. However, that letter can hardly be considered evidence that the SCS's decision was arbitrary. Mr. Siegel stated that based on his "brief review" of the data presented to him, the viability of a dam with a standing pool of water at the 12E site was "questionable". However, he indicated that he would need to have "hard data gathered on the project, as well as the EIS" to give a "formal hydrogeological opinion." Affidavit of John F. Vorrasi, sworn to July 21, 1988, Ex. K.

Further, plaintiff's reliance on the report of Larry Sherman, a Corps consultant, as conclusive proof that the 12E Dam will not be safe is misplaced. At the beginning of his report, Mr. Sherman qualifies his opinions by stating that he had to rely on a "limited amount of in house hydrologic data in analyzing the permit application," and that he was unfamiliar with the Chemung River Watershed. For these reasons, he therefore concluded that "the quality of [his] analysis [would] suffer." Vorrasi Affidavit, Ex. O. Further, Sherman stated that he was not familiar with procedures and methodologies employed by the SCS that apparently differ from those used by the Corps.

The court finds that these cursory reviews based on incomplete data do not establish that the SCS' decision in this regard was arbitrary and capricious. The SCS' decision regarding the safety of the 12E Dam is one that lies within the discretion of the agency. This court may not substitute its judgment for that of the responsible agency having expertise in this matter. Therefore, the court concludes that the DEIS and FEIS adequately consider the issue of dam safety.

### Alternative of Removing Fill from Newton Creek

Plaintiffs claim that the draft and final reports are fatally flawed because neither fully evaluates the alternative of removing some 200 feet of fill from Newton Creek to increase the creek's channel capacity. While the DEIS and FEIS do not include a separate, detailed discussion of this alternative, it was presented as a component of Alternative 1 which provided for channel improvement of Newton, Hoffman and Divens Creeks. Both the DEIS and the FEIS include a Table B which compares the various alternatives. That Table states that channel modification of Newton Creek would adversely impact the bass and trout populations at the Creek.

At the public hearing on the DEIS, a DEC spokesman provided some historical background for the Watershed Project. He stated that in the early 1950's the Corps constructed levees along the west bank of Newton Creek which provided protection against a flood of 18,000 cubic feet per second on the Creek. For various reasons fill was placed along the east side of Newton Creek between 1950 and 1973, reducing the protection of the Corps' west bank levees to 7,700 cubic feet per second. An industrial park is now located in the fill area.

As part of its review for issuance of the 404 permit, the Corps required documentation concerning the channelization alternative, among others. In response, the County provided documentation which indicated that the SCS had evaluated this alternative, but rejected it because, *inter alia*, it had adverse environmental effects on the fisheries in Newtown Creek, it would require the relocation of buildings, and the limited protection it provided did not meet the needs of the affected communities.

Exhaustive detail concerning reasonable alternatives is not required under NEPA. It is sufficient if the agency furnishes information needed to "enable those who did not have a part in the [EIS] compilation to understand and consider meaningfully the factors involved." *Sierra Club II, supra,* 772 F.2d at 1054. The court finds that the

public and reviewing agencies have been informed concerning this alternative and that the SCS has given it adequate consideration before making a decision.

### Benefit/Cost Ratio

Plaintiffs claim that the SCS failed to comply with the provisions of the Watershed Protection and Flood Prevention Act (Act), as amended, 16 U.S.C. § 1001 *et seq.*, specifically §§ 1003 and 1005, which require that the Secretary of Agriculture make a determination that the benefits of a watershed project exceed the costs before federal funds can be expended on the project.[4] They challenge the methodology employed by the SCS in determining that the benefit/cost ratio of completing the Watershed Project as proposed in the FEIS is 1.05:1. Plaintiffs claim that each remaining increment of the Watershed Project as proposed in the FEIS should have been analyzed separately, that certain benefits should not have been included in the calculation for the remaining increments, that the costs of relocating Route 13 were not fully included and that the discount rate of 4⅝% employed by the SCS was improper.

■ Contrary to plaintiffs' contention, the SCS did not err in analyzing the benefits and costs of the multi-dam project as a single unit. "It is clear ... that nothing in the Act itself requires that each individual 'work of improvement' proposed in a multi-unit watershed project have a favorable cost/benefit ratio ... § 5 [16 U.S.C. § 1005] requires only that the benefits of every 'plan' exceed the costs associated with implementing the plan; not that every segment of the plan be cost-justified when viewed in isolation." *Concerned Residents of Buck Hill Falls v. Grant,* 537 F.2d 29, 36 (3d Cir.1976).

Plaintiffs have not cited, nor has the court found, any authority which would require that the SCS calculate benefits and

costs in the manner they propose. Nor have they offered evidence that the benefit/cost ratio was calculated on the basis of inaccurate data or after inadequate consideration of the relevant factors.

Additionally, NEPA does not require that the environmental impact statement include a formal analysis of a project's monetary benefits versus its costs. "This conclusion rests upon the hard fact that there is sufficient disagreement about how environmental amenities should be valued to permit any value so assigned to be challenged on the grounds of its subjectivity. It follows that in most, if not all, projects the ultimate decision to proceed with the projects, whether made by Congress or an agency, is not strictly a mathematical determination." *Trout Unlimited, supra,* 509 F.2d at 1286.

Based on the record here and the moving papers, the court concludes that the analysis by the SCS was not arbitrary or capricious.

### Citizen Support

The court also finds that plaintiffs' contention that the Watershed Project does not enjoy strong local citizen and sponsor support as required by regulations under the Act is meritless. The record clearly shows that there is strong support for the Newton–Hoffman Creeks Watershed Project from the sponsors, area municipalities, legislators and the citizenry, notwithstanding the clamor raised by persons such as plaintiffs here. The Project is supported by the City of Elmira, Village of Elmira Heights, Towns of Horseheads, Southport, Chemung, VanEtten, Erin, Elmira and Ashland, and numerous legislators of the Chemung County Legislature. It is also clear that the Project has substantial support from residents and the business community of the affected area.

**4.** 16 U.S.C. § 1003 provides in pertinent part: "In order to assist local organizations in preparing and carrying out plans for works of improvement, the Secretary is authorized ... to make allocations of costs to the various purposes to show the basis of such allocations and to determine whether benefits exceed costs ..."

16 U.S.C. § 1005 provides in pertinent part: "At such time as the Secretary and the interested local organization have agreed on a plan for works of improvement, and the Secretary has determined that the benefits exceed costs, ... the local organization may secure engineering and other services...."

Notwithstanding their numerous complaints of wrongdoing, plaintiffs have not shown that the defendant agencies did not take the required "hard look" at the environmental consequences of constructing the 12E Dam and relocating state highway Route 13. Rather, they have emphatically expressed their view that there is no need for the 12E Dam because there are sufficient flood control and flood warning measures in place. In so doing, they lose sight of the fact that it is not the function of this court to determine the desirability of the subject Dam. The court merely determines whether the agencies responsible for the challenged action have acted rationally and with due consideration of the environmental consequences of their actions. In the present case, it finds that they have done so.

### Summary Judgment

Plaintiffs have moved for a preliminary injunction and defendants have cross-moved for summary judgment. The standards for granting a preliminary injunction are well established.

Before a preliminary injunction will issue in this circuit, the moving party must establish "(1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor." *Hudson River Sloop Clearwater v. Dept. of Navy*, 836 F.2d 760, 763 (2d Cir.1988) (citations omitted); *Britt v. United States Army Corps of Engineers*, 769 F.2d 84, 88 (1985).

In my view, plaintiffs have failed to establish a likelihood of success on the merits. In addition they have failed to establish irreparable harm and the balancing of hardships favors defendants not plaintiffs at this stage of the project.

Extensive discussion on the test for a preliminary injunction is not necessary since it is clear that summary judgment should be entered for defendants.

The standards for granting summary judgment are also well established. The moving party bears the initial responsibility of informing the court of the basis for its motion and of demonstrating the absence of a genuine issue of material fact. Fed.R. Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the moving party has made this initial showing, Rule 56(e) requires the non-moving party to go beyond the pleadings and to designate "specific facts showing that there is a genuine issue for trial." Mere speculation that an issue of material fact exists is not enough to defeat a Rule 56 summary judgment motion. *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 12 (2d Cir.1986). The role of the court is to determine whether there is a *genuine* factual issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.*, at 2510 (emphasis in original).

As discussed above, defendants are entitled to summary judgment based on the equitable doctrine of laches. In addition, defendants are entitled to summary judgment on their claims concerning violations of the procedural requirements of NEPA.

Although plaintiffs dispute whether the environmental impact statements adequately disclose relevant information, there are no genuine issues of material fact that are central to this court's very narrow review of the challenged agency action based on the administrative record only. Based on that record, the court concludes that the defendant agencies have not acted arbitrarily, capriciously, or abused their discretion, and that they have acted in good faith in accordance with the applicable federal laws.[5]

---

**5.** The complaint also alleges that defendants violated Executive Order 11988, and their rights under the Fifth Amendment. Neither claim has

merit. Executive Order (E.O.) No. 11988, "Floodplain Management," 42 *Fed.Reg.* 26,951 (1979), as amended by Executive Order No.

The record establishes that there has been substantial compliance with NEPA.[6] As discussed above, it is clear that the defendant agencies have fully considered the environmental consequences of constructing the Dam and relocating Route 13. The FEIS discusses reasonable and viable alternatives, environmental impacts of constructing the dams and relocating Route 13, including the elimination of 10.1 acres of prime farmland, the relocation of seven families, increased anxiety concerning possible failure of the dam and the periodic inundation of 57 acres of prime farmland, the effect of rerouting traffic, and the effects on development of the area. It also analyzes the positive and negative economic and social impacts of the selected alternative. Further, the FEIS discusses the impact of the proposed actions on the forest, brush, and wetlands, the wildlife and fish inhabiting those areas, and air and water quality.

In light of these analyses of the impacts of constructing the dams and relocating the highway, plaintiffs contention that the FEIS violates NEPA must fail. "NEPA ... does not require that all impacts be discussed in exhaustive detail but only that the EIS furnish such information as appears to be reasonably necessary under the circumstances for the evaluation of the project." *Britt,* 769 F.2d at 91. The court finds that the SCS made a reasonably adequate compilation of relevant information

and that such information is reasonably accurate.

The court also finds that the Corps' decision to issue the 404 permit was proper. The Corps' determination that construction of the 12E Dam posed no significant adverse environmental impacts on the marine environment was not arbitrary or capricious. It fulfilled its responsibilities under the Clean Water Act by giving public notice and conducting a hearing on the County's application, and by making its own assessment of the impacts of the proposed project.

### Conclusion

For the reasons discussed herein, the plaintiffs' motion for a preliminary injunction is denied and the defendants' motions for summary judgment are granted.

SO ORDERED.

12148, 44 *Fed.Reg.,* 43,239 (1979), requires that federal agencies consider the impacts of federally financed or assisted projects on floodplains. E.O. 11988 contemplates that such an evaluation would be performed as part of the NEPA process. For the reasons discussed above, the court finds that the SCS complied with the mandates of E.O. 11988.

Regarding plaintiffs' due process claim, the vague allegation in the complaint that as a consequence of allegedly unlawful acts, defendants have "regulat[ed] to the point of taking" their property is totally unsupported by the record. Further, plaintiffs have not disputed that they were not the legal owners of property that was condemned and acquired for the Watershed Project; therefore, they do not have standing to challenge the condemnations. Even assuming, *arguendo,* that they could, there are no allegations of violations of the procedural and sub-

stantive due process rights of persons whose property was purchased for the Project: they do not allege that the condemnations occurred without notice and an opportunity to be heard or that the owners were not justly compensated.

**6.** In the affidavit of plaintiffs' counsel and in a supplemental brief submitted post-argument in support of their motion, plaintiffs assert that a number of significant changes in the plan for completion of the Watershed Project subsequent to the DEIS and FEIS require the preparation of a supplemental EIS. Even if the court viewed the conclusory statements in the attorney affidavit and brief as sufficient factual allegations, although they were not made in an affidavit by a party, the court finds that the changes plaintiffs assert have taken place would not warrant a new evaluation of environmental consequences of the Dam.